IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 32454-1-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| LISA MARIE MUMM, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, C.J. — Lisa Marie Mumm appeals her convictions for three counts of delivery of the controlled substance, methamphetamine. We affirm her convictions, but vacate school bus zone sentence enhancements and remand for review of discretionary legal financial obligations.

FACTS

In November 2012, the North Central Washington Narcotics Task Force commenced use of Lyle Long as a criminal informant. Long wished to ameliorate

charges of three counts of delivery of OxyContin by his cooperation with law enforcement.

On December 7, 2012, at the behest of the narcotics task force, Lyle Long sought to purchase methamphetamine from Lisa Marie Mumm. Before journeying to Lisa Mumm's home, Long met with task force members, who searched him and his car. After the searches, the task force issued Long marked buy money.

Lyle Long traveled to Lisa Mumm's residence and knocked on the front door. Narcotics task force agents Jeff Prock and Seth Thomas followed and observed Long enter Mumm's house at 95 Old Riverside Highway, Omak. Prock next observed a blonde woman exit the Mumm residence, approach a white Chevrolet Tahoe sports utility vehicle (SUV), briefly speak with the person in the SUV, and then reenter the house. Thomas identified the woman as Lisa Mumm. Long later identified the person in the Tahoe as Christian Aquino Gonzales. According to Long, Mumm carried a half gram of methamphetamine on her return inside the home. She separated some of the methamphetamine for her personal use and gave some of the drug to Long.

Three minutes after Lisa Mumm's exchange at the Chevrolet Tahoe, Lyle Long exited Mumm's residence. Narcotics task force officers again searched Long, his wife, and Long's vehicle and found no contraband or excess money. Long handed the task

force a small plastic bag with a "crystal-like substance in it." Report of Proceedings (RP) at 205. The substance tested positive as methamphetamine.

On January 4, 2013, Lyle Long returned to Lisa Marie Mumm's residence to purchase methamphetamine. Prior to Long's meeting with Mumm, task force member Seth Thomas searched Long and found no excess currency or contraband. After Long entered Mumm's home, Mumm exited the residence and entered a blue Ford Explorer. Long called and told Thomas that Mumm directed Long to drive to Gene's Harvest Foods in Omak. Long left Mumm's home and headed, in his own car, to the Omak grocery store. Thomas surreptitiously followed.

Once he arrived at Gene's Harvest Foods, Lyle Long again called law enforcement officer Seth Thomas and informed Thomas that Mumm intended to meet a supplier to acquire methamphetamine. Thomas observed a blue Ford Explorer, owned by Lisa Mumm's boyfriend, Robert Watts, enter Gene's Harvest Foods' parking lot. Long observed Robert Watts driving the Explorer. Task force member Thomas saw a woman in a black coat and a ball cap exit the passenger side of the Explorer and approach Long's vehicle. Detective Brian Bowling, who also observed the rendezvous, identified the woman as Lisa Mumm. Long paid money to Mumm. Thomas saw the same woman return to the Explorer and pivot into the grocery store.

3

As Lyle Long paid Lisa Mumm and before she entered the grocery store, the white Chevrolet Tahoe present during the December 7 sale, entered Gene's Harvest Foods' front parking lot. As Mumm entered the grocery store, Long phoned narcotics agent Seth Thomas and informed him that Mumm became frightened and shifted the consummation of the sale to the far side of the store building. Thomas observed Long's vehicle move to the other side of the building. Detective Brian Bowling observed Mumm's vehicle move.

On the far side of Gene's Harvest Foods' building, Lyle Long exited his car. Lisa Marie Mumm weighed the methamphetamine in her car and handed the drugs to Robert Watts, who tendered the controlled substance to Long. Long drove from the store and met task force officers at another site. Long delivered Seth Thomas a small bag of methamphetamine, after which Thomas searched Long's person and found no excess money or other contraband.

On January 30, 2013, North Central Washington Narcotics Task Force members Seth Thomas and Brian Bowling met with Lyle Long. Long explained that he attempted contact with Lisa Mumm and, in response, received text messages from Melissa Starzyk, Mumm's roommate. Long and Starzyk exchanged text messages about Long's purchasing methamphetamine, but the two could not arrange a convenient time for a

4

transaction. During one of his texts to Starzyk, Long gratuitously sent Starzyk a photograph of his penis.

On February 1, 2013, Lisa Marie Mumm sold methamphetamine to Lyle Long for a third and final time. Narcotics agent Seth Thomas searched Long before the transaction. Thomas found no money or contraband on Long. Detective Brian Bowling searched Long's car and found no money or contraband. Thomas provided purchase money to Long. Seth Thomas followed Long to Mumm's house. Inside Mumm's residence, Long paid Mumm, and the two agreed to meet at a park in Riverside for delivery of the methamphetamine.

Lisa Marie Mumm left her Omak house in Robert Watts' blue Ford Explorer and journeyed to Christian Aquino's home to retrieve methamphetamine. Long traveled to Riverside and waited twenty minutes. Lisa Mumm called Long and changed the delivery site from a park in Riverside to the intersection of Bide-A-Wee Street and Old Riverside Highway, halfway between the towns of Riverside and Omak. Melissa Starzyk, in the Ford Explorer, met Long at the intersection. Starcyk passed Long a magazine with methamphetamine therein.

On February 1, Lyle Long later met task force member Seth Thomas and transferred to him the bag of methamphetamine. Agent Thomas searched Long and

found $20 in Long's hat. Long lied and told Thomas the money was for purchase of milk for his son. Following questioning, Long admitted the money belonged to the task force. Long admitted that he purchased a smaller amount of methamphetamine in return for Lisa Mumm returning him $20.

As a result of his attempt to retain $20, the North Central Washington Narcotics Task Force arrested Lyle Long for theft and uttering a false statement to a public servant. Long pled guilty to both charges and to two counts of delivery of a controlled substance. At the time of Lisa Mumm's trial, Long had yet to be sentenced, but he anticipated receiving a forty-month drug offender sentencing alternative sentence. After the February 1 sale, the task force ceased utilizing Long as an informant.

On February 6, 2013, Brian Bowling and Seth Thomas met with Lisa Mumm and Roberts Watts and showed them a photo montage. Mumm identified a photograph of Christian Aquino Gonzales and disclosed that she purchased methamphetamine from him on a regular basis. Mumm declared that she "normally [buys] a teener or an eight-ball, never large amounts." RP at 316. Mumm added that she sometimes buys drugs seven times daily from Gonzales.

On February 21, 2013, the narcotics task force arrested Lisa Marie Mumm at Okanogan's Bingo Casino. Officers seized the blue Ford Explorer that Mumm then

6

drove.

Omak School District Transportation Supervisor Dan Wood provided narcotics agent Seth Thomas a list of school district bus stops with their addresses. With a Rolatape Model 34 rolling wheel measuring tape, Thomas measured the distance between the nearest bus stop and the location of each methamphetamine sale by Lisa Mumm. The distance from 95 Old Riverside Highway, the site of the December 7 sale, to the closest bus stop was 463 feet. The distance from Gene's Harvest Food, the site of the January 4 sale, to the nearest bus stop was 450 feet. The distance from Christian Aquino's residence, where Mumm got the methamphetamine for the February 1 sale, to a bus stop was 509 feet. The intersection of Bide-A-Wee Street and Old Riverside Highway, where Starzyk delivered the drugs to Long on February 1, includes a bus stop.

## PROCEDURE

The State of Washington charged Lisa Marie Mumm with three counts of delivery of methamphetamine and one count of possession of methamphetamine. At the beginning of trial, during discussion of motions in limine, the State agreed not to mention Lisa Mumm's past criminal convictions during its case in chief, but wished to reserve the right to introduce evidence of past convictions if Lisa Mumm testified or otherwise opened the door to the testimony.

7

During trial, Melissa Starzyk testified that buyers of methamphetamine came to Lisa Mumm's home five to seven times per day. Starzyk knew that Mumm sold Lyle Long drugs. Starzyk testified to her convictions for theft in the third degree and a delivery of a controlled substance. She conceded she used methamphetamine regularly. Starzyk also testified that Mumm evicted her from their shared home.

Omak School District Transportation Supervisor Dan Wood testified, during trial, that the school district maintained a bus stop at 102 Old Riverside Highway during the 2012-13 school year. Wood identified a school bus stop at Bartlett Avenue and the alley behind a bank near Gene's Harvest Foods. Wood also testified to a bus stop at 29789 Highway 97 and another at the intersection of Bide-A-Wee Road and Old Riverside Highway.

On direct examination, Lyle Long testified to convictions of theft in the first degree and possession of stolen property. The State introduced into evidence text messages between Lisa Mumm and Lyle Long concerning drug sales. Mumm's counsel then cross examined Lyle Long about his relationship with Mumm.

> Q And when did—Did Ms. Mumm move in with you and your father?
> A Yes.
> Q When was that?
> A (Inaudible) young. I was pretty young. I didn't quite remember dates that well.

Q Would you characterize Ms. Mumm, your father and you, were you living—was that a family type environment?

A Some people will try to call it that.

Q How would you characterize it?

A As just one of my dad's girlfriends.

Q And how long did Ms. Mumm live there?

A Thirteen years.

Q And during those thirteen years, would you characterize Ms. Mumm as your stepmother?

A No.

Q How would you characterize her?

A (Inaudible)—

[State]: Again, I'm going to object to the relevance. We also would ask to take a matter up outside the presence of the jury based on earlier— motion by the state regarding—admission of evidence.

THE COURT: I'm going to ask the jury to step out, please. Thank you.

*Jury out*

THE COURT: Thank you. You may be seated. (Inaudible) argument, Mr. Sloan.

[State]: Your Honor, I guess this is more of a fair warning argument for the state, in that if counsel seeks to go into this type of background the state would request the permission to go into additional background that would arguably fall under the 404(b) evidence that the defendant is seeking to keep out, and prior criminal history, which involves ongoing drug dealing and the defendant's prior arrests for task force delivery activity, which would have occurred during and ultimately at the end of this—the time that she was with the defendant's father [sic].

So, counsel is not generally permitted to ask the background information without the other party being able to basically ask about those same incidences, what was really going on. What's trying to be portrayed here is effective character evidence that somehow she was acting in a motherly stepmother role here, where the reality is quite different.

We're asking—we're basically asking the court that if the defendant is going to go there that we're allowed to explore this area—more fully.

9

And so we're doing this more as a motion to—to give the defense the ability to decide that, but if they do go there we are asking for it to let us explore this more fully.

Because it's around—it's through the same time frame.

Thank you.

THE COURT (off mic'): You may be opening a door there, Mr. Blount [defense counsel]. Now that you're kind of reading between the lines,—(inaudible) appear—indicating that they're in a family environment and (inaudible) reason her—his father and she were engaged in other activities, you may be opening a door here, (inaudible) you may not want to open. I don't know.

So,—I don't know this. Because obviously [the State] (inaudible) and I didn't.

So, I'm understanding Mr. Sloan is giving you (inaudible) warning that at this point—

[Defense Counsel]: (Inaudible)—

THE COURT: —shot across the bow, but—so to speak, that it may explore, and the court would be more inclined to open it up and allow that exploration if in fact it goes on further.

I don't know the purpose of the inquiry. You've laid some foundation, but after a while it gets beyond basically what I'll characterize as some preliminary, but I've allowed it to a certain point.

Do you want to respond to Mr. Sloan's (inaudible)?

[Defense Counsel]: Yes, your Honor.

The reason for this questioning are two. This goes to the witness' motive and bias. Secondly,—we understand the state intends—We understand that this would open the door. Defense has already—thought this through. And if the state wishes to pursue that we have no objection—if we open the door.

THE COURT: I don't think he's quite opened it, Mr. Sloan—but he's certainly headed in that direction. I hear what you're saying—

[The State]: Thank you.

THE COURT:—indicated it's a warning to him that there may be a question or two away from that door being opened. (Inaudible), and basically if there's other activities going on that he can testify to that would

10

point to your (inaudible), Mr. Blount, you need to be—I guess you're put on notice at this point.

And basically under Rule 404(b), we're talking about evidence of other crimes, wrongs or acts that (inaudible) character, but however may be admissible if there's indication—you talked about motive, intent, (inaudible) or opportunity, here—you're indicating you may be headed down that direction.

[Defense Counsel]: Understood, your Honor.

THE COURT: With that in mind, do you have any further comment?

[Defense Counsel]: No, your Honor.

. . . .

Q So, Mr. Long, what you had just stated was—testified was that you and Ms. Mumm and your father lived in the same household for 13 years, correct?

A Yes.

Q And—when did you leave the household?

A Off and on (inaudible) 13 years.

Q So during those 13 years—when you're saying you lived off and on, can you be a little more specific what that means?

A (Inaudible) live there so I moved out. I lived on the streets.

RP at 388-93.

On redirect, the State elicited the following testimony from Lyle Long:

Q And did Ms. Mumm indicate—a reason why she was nervous about that?

A Because she didn't want to go to prison.

Q Again?

A Again.

Q Was the task force involved—when you say the raid, was—that a task force case, at your father's house involving Ms. Mumm?

A Yes.

Q And your—your father at that point?

A Yes.

Q Was that the end of their relationship?

11

A Yeah. That's what started it. And after she got out she came back (inaudible) for six months and then that was—my dad kicked her out. 'Cause she (inaudible) to go right back to the same routine.

Q And the house where this was at, was that your—house owned by your dad?

A Yes.

Q So it wasn't—wasn't her house.

A No.

Q And was that involving methamphetamine?

A Yes.

Q Is that—when you were in contact with the task force, is that why you believed you could obtain methamphetamine—

A Yeah.

Q — from Ms. Mumm?

A Yep.

RP at 404-06.

Lisa Mumm defended the prosecution by contending her former roommate Melissa Starzyk sold the methamphetamine. Mumm declared that Starzyk frequently borrowed her phone and car. Mumm testified that Long regularly visited her house for five months to see Starzyk. Mumm admitted exchanging text messages with Long regarding selling him methamphetamine, but claimed she contacted Long on behalf of Starzyk. During trial, witnesses Starzyk and Lyle Long refuted the contention that Starzyk sold Long methamphetamine. Mumm explained that she interfaced with Christian Aquino Gonzales because she borrowed money from him.

12

On direct examination, defense counsel asked Lisa Mumm: "were you charged

with anything?" RP at 474. Mumm responded "[t]hree counts of delivery." RP at 474.

Counsel then inquired: "is that—the only felony that you were charged with?" RP at 474.

Mumm answered that the State also charged her with escape. She explained that a prison

allowed her a three-day furlough to locate her daughter, and she failed to return. On

cross examination, the State explored those statements:

> Q Ms. Mumm, you had testified—you were asked your—your
> experience in—dealing with drugs. And you indicated that your experience
> in dealing with drugs was an incident back when?
> A (Inaudible).
> Q And you said you were charged with just three counts.
> A Three counts of delivery, yes.
> Q That's not exactly true, is it.
> A And the—and the escape.
> Q You were charged with twelve counts, weren't you?
> A Oh. When I—Yeah. They (inaudible) twelve counts on me,
> but—
> Q Those counts included other counts of delivery, unlawful use of
> building for drug purposes, possession of a controlled substance other than
> marijuana, use of drug paraphernalia, and four counts of unlawful
> possession of a firearm?
> A I don't even know how they—I did not have no—no firearm.
> Those were—
> Q You were charged with those crimes?
> A Yeah.
> Q And there was an agreement for you to plead—it wasn't twelve-
> plus months; it was 20 months. Correct?
> A Yeah, but—Yeah, but I did—I did—
>
> . . . .

13

Q Now that's not really the only dealings you had back in that time, was it? Those were—those weren't the only dealings you had with drugs. Isn't it true that you worked—had other cases open that you worked with the task force back at that time?

A One time.

Q Wasn't it two times?

A I only recall one time.

. . . .

Q But then you got caught delivering [methamphetamine] again after that, which is what resulted in you being charged and ultimately convicted.

A Correct.

RP at 497-99.

At the close of trial testimony, Lisa Marie Mumm proposed a limiting instruction

in accordance with 11 *Washington Practice: Washington Pattern Jury Instructions:*

*Criminal* 5.05, at 172 (3d ed. 2008) (WPIC). The proposed jury instruction read:

You may consider evidence that the defendant has been convicted of a crime only in deciding what weight or credibility to give to the defendant's testimony and for no other purpose.

RP at 535. The trial court denied giving the jury instruction on the basis that Mumm

opened the door to the testimony and thus the State used the testimony as substantive,

rather than impeachment, evidence. In its ruling, the trial court emphasized a note to

pattern instruction 5.05:

Use this instruction only when a defendant is a witness and a prior conviction has been admitted solely for impeachment purposes. It should not be given if a prior conviction was admitted for a substantive purpose.

14

No. 32454-1-III
*State v. Mumm*

RP at 536.

At the State's request, the trial court delivered the following jury instruction:

"School bus" means a vehicle that meets the following requirements: (1) has a seating capacity of more than ten persons including the driver; (2) is regularly used to transport students to and from school or in connection with school activities; and (3) is owned and operated by any school district or privately owned and operated under contract or otherwise with any school district for the transportation of students.

Clerk's Papers at 83.

The jury found Lisa Mumm guilty of three counts of delivery of methamphetamine. The jury also returned special verdicts, in which it found that all three deliveries occurred within 1,000 feet of a school bus stop.

At sentencing, the trial court imposed $4,570.50 in legal financial obligations. The discrete obligations included a $500.00 victim assessment charge, $220.50 for the criminal filing fee and sheriff service fees, a $100.00 deoxyribonucleic acid (DNA) collection fee, a $40.00 booking fee, a $3,000.00 VUCSA fine, and $460.00 in restitution. The sum of those numbers totals $4,320.50. The trial court struck that number from the bottom of the judgment and sentence and wrote $4,570.50.

15

LAW AND ANALYSIS

On appeal, Lisa Marie Mumm challenges her convictions for delivery of a controlled substance on the ground that her counsel ineffectively failed to object to improper character evidence. Mumm also challenges the school bus route enhancements. Finally, Mumm questions the imposition of some of the legal financial obligations. We affirm the delivery convictions, vacate the sentencing enhancements, and remand for a new review of legal financial obligations.

### Ineffective Assistance of Counsel

Lisa Mumm alleges that her trial counsel was ineffective for failing to object to the admission of unproven criminal charges and Lyle Long's testimony that she frequently dealt drugs. The State counters by saying that her counsel was not ineffective for failing to object to the testimony because Mumm's counsel opened the door to it. We do not address whether trial counsel performed deficiently since we can resolve Mumm's claim on the lack of prejudice.

A claim of ineffective assistance of counsel requires a showing that (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Grier*, 171 Wn.2d 17, 32-33, 246 P.3d 1260 (2011); *State v. Hamilton*, 179 Wn.

App. 870, 879, 320 P.3d 142 (2014). If one prong of the test fails, we need not address the remaining prong. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996).

For the deficiency prong, this court bestows great deference to trial counsel's performance and begins the analysis with a strong presumption that counsel performed effectively. *State v. West*, 185 Wn. App. 625, 638, 344 P.3d 1233 (2015). Deficient performance is performance that falls below an objective standard of reasonableness based on consideration of all circumstances. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). The defendant bears the burden to prove ineffective assistance of counsel. *State v. McFarland*, 127 Wn.2d at 335.

Trial strategy and tactics cannot form the basis of a finding of deficient performance. *State v. Johnston*, 143 Wn. App. 1, 16, 177 P.3d 1127 (2007). The decision of when or whether to object to testimony is a classic example of trial tactics. Only in egregious circumstances, on testimony central to the State's case, will the failure to object constitute incompetence of counsel justifying reversal. *State v. Madison*, 53 Wn. App. 754, 763, 770 P.2d 662 (1989).

Under Washington precedence, a defendant bears the burden of showing, based on the record developed in the trial court, that the result of the proceeding would have been different but for counsel's deficient representation. *State v. McFarland*, 127 Wn.2d at

17

337. If the defendant claims that defense counsel should have objected to evidence, the defendant must establish that the trial court probably would have sustained the objection. *State v. McFarland*, 127 Wn.2d at 337 n.4.

Lisa Mumm argues that her trial counsel was ineffective on two occasions: (1) when the State cross-examined Mumm about drug dealing while living with Lyle Long and his father, and (2) when the State elicited testimony from Lyle Long claiming that Mumm frequently sold drugs. Assuming Mumm's counsel inadequately performed, we conclude the alleged inadmissible testimony did not prejudice her.

Lisa Marie Mumm argues that the improper character evidence prejudiced her because the trial turned on the credibility of witnesses. Nevertheless, the State presented overwhelming evidence to establish that Mumm delivered methamphetamine on three occasions to Lyle Long. The State presented Mumm's own statements about selling methamphetamine, her text messages, multiple police officer's testimony, the methamphetamine she sold, and Lyle Long and Melissa Starzyk's testimony. Mumm's testimony that she sent texts to Lyle Long to facilitate the methamphetamine sales on behalf of Melissa Starzyk destroyed, rather than advanced, her defense. The testimony implicated Mumm as an accomplice. RCW 9A.08.020. The same criminal liability

18

attaches to a principal and her accomplice because they share equal responsibility for the

substantive offense. *State v. Silva-Baltazar*, 125 Wn.2d 472, 480, 886 P.2d 138 (1994).

### WPIC 5.05

Lisa Mumm next assigns error to the trial court's refusal to issue a WPIC 5.05

instruction limiting the jury's ability to consider her prior convictions. WPIC 5.05 reads:

> You may consider evidence that the defendant has been convicted of
> a crime only in deciding what weight or credibility to give to the
> defendant's testimony, and for no other purpose.

WPIC 5.05, at 172. The State responds that the proposed instruction would be

inappropriate because evidence of other drug sales was admitted substantively. We do

not address the merits of Mumm's argument, because of the lack of prejudice resulting

from the refusal to give the jury instruction.

A trial court must give a limiting instruction when evidence is admitted for one

purpose but not for another and the party against whom the evidence is admitted requests

the trial court give the instruction. *State v. Gallagher*, 112 Wn. App. 601, 611, 51 P.3d

100 (2002). Therefore, in order to determine whether a limiting instruction was properly

refused, a court must determine the purpose for which the testimony was admitted.

The State argues that evidence of Lisa Mumm's earlier unproven charges and Lyle

Long's testimony that Mumm often sold illicit drugs were admitted for substantive

19

purposes. The State maintains that defense counsel elicited some of the testimony and opened the door to the rest when counsel questioned Long about Mumm living with him and his father. The State believes the evidence of the living arrangement rendered a misperception that Mumm created a family environment at Lyle Long's home, when Mumm's presence actually caused havoc because of her methamphetamine sales. The State contends evidence of earlier drug transactions addressed Mumm's knowledge, bias, and motive and the testimony rebutted assertions uttered by Mumm during her testimony.

Generally, evidence of earlier convictions and wrongful acts represents impeachment, not substantive evidence. *State v. Jones*, 101 Wn.2d 113, 120-21, 677 P.2d 131 (1984), *overruled on other grounds by State v. Brown*, 111 Wn.2d 124, 761 P.2d 588 (1988) (pluality opinion), *adhered to on other grounds on recons.*, 113 Wn.2d 520, 782 P.2d 1013 (1989). "Substantive evidence" is defined as "[e]vidence offered to help establish a fact in issue, as opposed to evidence directed to impeach or to support a witness's credibility." BLACK'S LAW DICTIONARY 678 (10th ed. 2014). Whereas "impeachment evidence" is defined as "[e]vidence used to undermine a witness's credibility." BLACK'S LAW DICTIONARY 676 (10th ed. 2014).

We question whether evidence of Lisa Mumm's earlier crimes or drug sales helps to prove she committed the three charged crimes. The State asked to introduce evidence

20

of the earlier sales to counter the defense suggestion that Lisa Mumm lived with Lyle Long in a family environment. This purpose tends to impeach Mumm's testimony concerning her relationship with Lyle Long, but does not directly show sales of drugs in 2012 and 2013. Still, we recognize the possibility that the evidence could be considered substantive evidence under the issues raised by the State and Mumm's own testimony. We need not resolve this interesting question, because we rule any erroneous failure to deliver the jury instruction was harmless.

An error is harmless if the outcome of the proceeding would have been the same even if the error had not occurred. *State v. Jackson*, 102 Wn.2d 689, 695, 689 P.2d 76 (1984). The error must be harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 22, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967).

As the State argues, WPIC 5.05 would not cover all of the evidence Lisa Mumm argues needed to be limited. The jury instruction would only blanket the convictions, not the information of Long's drug dealing. In addition, as already analyzed, the State presented a large quantity of admissible evidence that established Mumm's guilt, including Mumm's own statements about selling methamphetamine, her text messages, multiple police officer's testimony, the methamphetamine she sold, and Lyle Long's and

21

Melissa Starzyk's testimony. The refusal to give a limiting instruction was harmless beyond a reasonable doubt.

## School Bus Stop Enhancements

Lisa Mumm argues that insufficient evidence supported the school bus route stop enhancement because the State failed to prove the seating capacity of the buses in question. Mumm argues that, because the jury instruction's definition of a school bus included the bus's seating capacity, the law of the case doctrine required the State to prove the seating capacity. The State responds that the seating capacity is not a necessary element of the sentencing enhancement and that the law of the case doctrine does not apply to definitional instructions. We agree with Mumm and reverse the sentence enhancements.

Evidence is sufficient if a rational trier of fact could find each element of the crime beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 221-22, 616 P.2d 628 (1980). Both direct and indirect evidence may support the jury's verdict. *State v. Brooks*, 45 Wn. App. 824, 826, 727 P.2d 988 (1986). This court draws all reasonable inferences in favor of the State. *State v. Partin*, 88 Wn.2d 899, 906-07, 567 P.2d 1136 (1977). Only the trier of fact weighs the evidence and judges the credibility of witnesses. *State v. Carver*, 113 Wn.2d 591, 604, 781 P.2d 1308, 789 P.2d 306 (1989).

22

A "school bus route stop" "means a school bus stop as designated by a school district." RCW 69.50.435(6)(c). The State correctly notes that seating capacity is not part of the definition of a school bus. RCW 69.50.435(6)(b) defines "school bus" as:

> . . . a school bus as defined by the superintendent of public instruction by rule which is owned and operated by any school district and all school buses which are privately owned and operated under contract or otherwise with any school district in the state for the transportation of students.

Nevertheless, the State's proposed jury instruction, accepted by the trial court, defined a school bus as containing at least eleven seats. The State presented no evidence as to the capacity of the school buses that utilized the stops near the situs of Lisa Mumm's methamphetamine sales.

Under the law of the case doctrine, jury instructions not objected to become the law of the case. *State v. Hickman*, 135 Wn.2d 97, 102, 954 P.2d 900 (1998). A defendant may assign error to the sufficiency of the evidence element added by a jury instruction. *State v. Hickman*, 135 Wn.2d at 102. The law of the case tenet is a broad doctrine that courts apply to to-convict instructions and definitional instructions. *State v. Calvin*, 176 Wn. App. 1, 21, 316 P.3d 496 (2013), *review granted in part*, 183 Wn.2d 1013, 353 P.3d 640 (2015).

23

Legal Financial Obligations

Lisa Mumm next argues that the trial court erred by imposing legal financial obligations. Mumm makes the argument without citing *State v. Blazina,* 182 Wn.2d 827, 344 P.3d 680 (2015), because she submitted her brief in December 2014. The State responds that the court should not address the issue because Mumm failed to object below to imposition of the financial obligations. The State also argues that evidence shows that Mumm has the current or future ability to pay.

In *State v. Blazina,* our Supreme Court clarified that RCW 10.01.160(3) requires the trial court "do more than sign a judgment and sentence with boilerplate language stating that it engaged in the required inquiry." *Blazina,* 182 Wn.2d at 838. Rather, the record must reflect that the trial court conducted an individualized inquiry into the defendant's current and future ability to pay. This inquiry includes evaluating a defendant's financial resources, incarceration, and other debts, including restitution. This inquiry, however, is only required for the imposition of discretionary legal financial obligations. *State v. Lundy,* 176 Wn. App. 96, 103, 308 P.3d 755 (2013).

We must first decide whether to address this assignment of error given that Lisa Mumm did not object to the imposition of legal financial obligations at trial. RAP 2.5(a) provides, in relevant part: "The appellate court may refuse to review any claim of error

24

which was not raised in the trial court." With respect to unpreserved challenges to legal financial obligations, our high court clarified in *Blazina*: "A defendant who makes no objection to the imposition of discretionary [legal financial obligations] at sentencing is not automatically entitled to review." *Blazina*, 182 Wn.2d at 832. "Each appellate court must make its own decision to accept discretionary review [of claimed LFO errors not appealed as a matter of right]." *Blazina*, 182 Wn.2d at 835. Nevertheless, the *Blazina* court clarified that a challenge to the trial court's entry of a legal financial obligation order under RCW 10.01.160(3) is ripe for judicial determination. Despite the minimal amount of mandatory legal financial obligations imposed, we grant Mumm's request to review her assigned error because we remand the case anyway for sentencing without the sentence enhancements.

The State argues that the trial court conducted a sufficient analysis of Lisa Mumm's present and future ability to pay during the trial. The State emphasizes that Mumm testified to unreported income and minimal expenses. We consider this testimony insufficient, because no one quantified the income or expenses. The trial court also engaged in no inquiry or analysis of Mumm's ability to pay.

The trial court imposed mandatory legal financial obligations of a $500 victim assessment fee, a $200 criminal filing fee, and a $100 DNA collection fee. *State v.*

25

*Munoz-Rivera*, 190 Wn. App. 870, 880, 361 P.3d 182 (2015). These three fees may not be challenged. We remand to the trial court to determine whether Lisa Mumm can or will possess the capability to pay the $40.00 booking fee and $20.50 sheriff service fees.

Lisa Mumm also argues that the trial court erred in adding up the legal financial obligations in the judgment and sentence. Since we are remanding for a new determination of legal financial obligations, Mumm can raise any purported calculation mistake with the trial court on remand. *State v. Healy*, 157 Wn. App. 502, 516, 237 P.3d 360 (2010).

## VUCSA Fines

Lisa Mumm contends that the trial court erred by imposing $3,000 in fines, pursuant to the Violations of the Uniform Controlled Substance Act, chapter 69.50 RCW in Washington (VUCSA), because the trial court found her indigent for purposes of appointing defense counsel at the commencement of the prosecution. The State does not respond to this assignment of error.

A drug offender usually also violates VUSCA and thereby subjects herself to additional fines. Former RCW 69.50.430 declares:

> (1) Every person convicted of a felony violation of RCW 69.50.401
> . . . shall be fined one thousand dollars in addition to any other fine or
> penalty imposed. Unless the court finds the person to be indigent, this
> additional fine shall not be suspended or deferred by the court.

26

> (2) On a second or subsequent conviction for violation of any of those laws listed in subsection (1) of this section, the person shall be fined two thousand dollars in addition to any other fine or penalty imposed. Unless the court finds the person to be indigent, this additional fine shall not be suspended or deferred by the court.

Former RCW 69.50.430 (2003).

This court previously addressed VUCSA fines in *State v. Mayer*, 120 Wn. App. 720, 86 P.3d 217 (2004). In *Mayer*, John Mayer pled guilty to manufacturing methamphetamine. The trial court declined to impose a VUSCA $2,000 fine because it reasoned Mr. Mayer's incarceration would render him indigent. This court determined that RCW 69.50.430 is mandatory and the sole exception lies when the trial court finds the defendant to be indigent. In addressing the trial court's finding of indigency, the court commented that RCW 69.50.430's use of the verb "to be" commands the trial court to assess indigency in accordance with the person's situation at the time of sentencing, not as the situation was in the past. *State v. Mayer*, 120 Wn. App. at 728.

Lisa Marie Mumm argues that her indigency for purposes of appointment of counsel qualifies her as indigent for purposes of the fine imposed under RCW 69.50.430. She does not contend she was indigent at the time of sentencing. Under *State v. Mayer*, the trial court assesses indigency at the time of sentencing, not commencement of the prosecution. 120 Wn. App. at 728. Therefore, we reject Mumm's assignment of error.

27

Nevertheless, we note that Mumm may raise the issue again at resentencing.

## STATEMENT OF ADDITIONAL GROUNDS

In her statement of additional grounds, Lisa Mumm attaches a portion of a newspaper article describing the criminal sentences imposed on Lyle Long, the State of Washington's confidential informant, for violation of a protective order, residential burglary, bail jumping, and delivery of Oxycodone. She states the article comes from the Omak Chronicle. Mumm claims the convictions reflect on the credibility of Long. She does not provide any argument as to whether any lack of credibility of Lyle Long impacts her convictions.

A criminal defendant may submit a pro se statement of additional grounds for review "to identify and discuss those matters related to the decision under review *that* the defendant believes have not been adequately addressed by the brief filed by the defendant's counsel." RAP 10.10(a). The rule additionally declares:

> Only documents *that* are contained in the record on review should be attached or referred to in the statement.

RAP 10.10(c); *see also State v. Alvarado*, 164 Wn.2d 556, 569, 192 P.3d 345 (2008). Lisa Marie Mumm violates this rule. We do not accept as verity hearsay statements from newspaper articles.

28

## CONCLUSION

We affirm Lisa Mumm's convictions for delivery of methamphetamine, but vacate the three school bus stop sentence enhancements. We remand for the trial court to strike the enhancements and to engage in an inquiry as to whether, and in what amount, the court should impose discretionary legal financial obligations. Mumm may also raise any alleged inability to pay the $3,000 VUSCA fine on resentencing.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Fearing, J.

_____
Fearing, C.J.

WE CONCUR:

_____     _____
Lawrence-Berrey, J.                 Pennell, J.

29