IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 34394-4-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TYREE Q. HOUFMUSE, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, C.J. — Appellant Tyree Houfmuse shot and wounded his attacker,

Anthony Asselin. A jury acquitted him on the charge of first degree assault, but

convicted him on the charge of felon in unlawful possession of a firearm. On appeal,

Houfmuse contends he suffered ineffective assistance of counsel because his trial counsel

did not raise the defense of necessity in response to the unlawful possession charge. We

conclude that, based on evidence presented at trial, Houfmuse was entitled to a jury

instruction on the necessity defense and his trial counsel committed professional error by

failing to assert the defense. Therefore, we reverse the conviction and remand for a new

trial.

## FACTS

This prosecution arises from the shooting of Anthony Asselin by appellant Tyree

Houfmuse. Houfmuse's past criminal record included an earlier felony conviction.

Therefore, the State charged Houfmuse with both assault and unlawful possession of a firearm. Our factual outline arises from trial testimony.

The facts begin with the relationship between Anthony Asselin and Aquarius Gibbs, who later befriended appellant Tyree Houfmuse. Asselin and Gibbs met at the beginning of 2011. Gibbs gave birth to the couple's daughter on May 1, 2012. After the child's birth, Asselin and Gibbs intermittently cohabitated until the end of 2012. The relationship conclusively ended at the end of 2013. Near the end of the duo's relationship, Asselin physically abused Gibbs. Asselin stands six feet, four inches, and weighs approximately two hundred and eighty pounds.

In September 2014, Tyrell Houfmuse began wooing Aquarius Gibbs. At some unknown time, Houfmuse and Gibbs resided together in a Pasco abode. Houfmuse also knew Anthony Asselin, primarily through Asselin's younger brother. Asselin treated Houfmuse cordially until Houfmuse dated Gibbs.

Shortly after Tyree Houfmuse and Aquarius Gibbs commenced courting, Anthony Asselin warned Houfmuse to "[s]top hanging out with my 'F'ing baby momma, and stay away from my kids." Report of Proceedings (RP) at 347. The "baby momma" is Aquarius Gibbs. We are unaware of Asselin fathering more than one child. Asselin's intimidation rapidly escalated to death threats. On one occasion, Asselin cautioned Houfmuse: "If I run into you with my baby momma, it's a rap." RP at 351. "It's a rap" means "you're dead." RP at 351.

2

During the fall of 2014, Anthony Asselin menaced Tyree Houfmuse and Aquarius Gibbs on a daily basis. Houfmuse perceived the threats seriously. He knew of Asselin's explosive temper and reputation for violence. Houfmuse avoided Asselin and stayed inside his home. Houfmuse did not notify the police of the intimidation because Houfmuse knew Asselin did not fear the police. Houfmuse worried that Asselin would retaliate against him for contacting the police.

During the week before Thanksgiving 2014, Anthony Asselin and some compatriots assaulted Tyrell Houfmuse's brother, Rodrell Houfmuse, in Hermiston, Oregon, twenty-five miles south of Kennewick. Asselin and two other men visited the house of Rodrell's friend Joseph, looking for Rodrell's cousin, Little Tony. Rodrell informed the trio of Little Tony's absence, but Asselin and companions, with pistols in hand, forced their way into the house. After confirming Rodrell's comment, the three men commanded Rodrell to step outside. Rodrell acquiesced. Once all four went outside, the troika asked Rodrell about his relationship with one of the men's ex-girlfriends. Asselin and his associates then punched Rodrell, who sustained a swollen jaw, busted lip, and bumps to his head. Later that night, Rodrell informed his brother Tyree Houfmuse about the pummeling. Houfmuse suspected that Asselin assaulted his brother because Houfmuse courted Aquarius Gibbs.

After the assault on Rodrell Houfmuse, Tyrell Houfmuse and Aquarius Gibbs discussed needing protection. During trial testimony, Houfmuse averred that he never

3

mentioned a gun during the discussion. On cross-examination, however, Houfmuse conceded that, when he conferred with Gibbs about protection, he contemplated any needed protection, including the police and a gun. Because of an earlier felony, Houfmuse could not legally possess a gun. Aquarius Gibbs first testified at trial that the couple discussed protection, but neither mentioned the use of a gun. She later conceded, however, of the two speaking about a gun. Gibbs admitted to seeing a gun wrapped in a towel on a dresser at the residence she shared with Houfmuse. According to Gibbs, the gun could have belonged to someone other than Houfmuse because other men were present in the home when she viewed the gun.

On the evening preceding Thanksgiving 2014, Tyrell Houfmuse, Aquarius Gibbs, and Cheryle Dixon patronized the Village Tavern in Kennewick. The State charged Houfmuse with shooting Anthony Asselin at the tavern. We relate the differing witness accounts of the shooting, including the accounts of tavern patrons Felicia Richardson and Ariel Mitchell.

According to Tyrell Houfmuse, he visited the Village Tavern for a drink because he knew Anthony Asselin did not frequent the bar. The tavern attracted an older crowd, and African-Americans did not patronize the establishment. Asselin is African-American. Houfmuse ordered a shot of tequila at the bar. Fifteen minutes later and as he procured his alcohol, Houfmuse noticed African-Americans, including a friend of Asselin, entering the Village Tavern. Houfmuse walked outside to smoke a cigarette. As

4

he smoked his cigarette, two or three carloads of African-Americans drove into the tavern's parking lot. Asselin exited one of the vehicles. Houfmuse rushed into the bar and told Aquarius Gibbs they needed to leave because of Asselin's presence. Before they departed the Village Tavern, Asselin entered with his friends behind him. Asselin yelled to Houfmuse: "[w]hat did I tell you I was going to do if I catch you with my baby momma?" RP at 369.

Tyree Houfmuse testified at trial that he attempted to calm Anthony Asselin. A frightened Houfmuse left the bar, only to have Asselin follow him. Asselin, with his hands in a fighting stance, advanced toward Houfmuse. Houfmuse tried to enter his car, but Asselin's friends surrounded Houfmuse and blocked access to the vehicle. Asselin uttered more loud threats. Asselin proclaimed: "I told you anybody that get[s] involved, they were going to get it." RP at 378. Asselin retrieved a gun from his clothing and a struggle ensued. Houfmuse had been unaware that Asselin possessed a gun. A panicked Houfmuse grabbed Asselin's arm in order to wrest the gun from Asselin. During the struggle, Asselin pulled the trigger and shot several rounds that struck the pavement. Houfmuse extracted the gun and retreated. Asselin, while swinging his fists, pursued Houfmuse. Because of Asselin's size, Houfmuse was terrified. As Houfmuse ran from Asselin, he shot the gun two or three times behind him without looking back. Houfmuse did not know whether a bullet struck Asselin. Houfmuse dropped the gun on the ground before he entered the car and fled.

5

Aquarius Gibbs testified during trial that Anthony Asselin entered the Village Tavern and yelled at Tyree Houfmuse and her about Asselin's daughter. Houfmuse and Asselin went outside. While Gibbs stood near the tavern door, she heard gunshots, but did not see any shooting. Houfmuse called to Gibbs: "come." RP at 181. Gibbs entered the car and rode with Houfmuse away from the tavern.

During the trial, Felicia Richardson testified that she stood in the parking lot near her vehicle and saw Tyree Houfmuse and Anthony Asselin talking. She anticipated a fight. As Asselin walked away, Houfmuse shot Asselin in the back.

Another Village Tavern patron, Ariel Mitchell, testified that she saw Tyree Houfmuse remove a gun from his coat and shoot Asselin seven times. Mitchell was a friend of Anthony Asselin, and Asselin was related to a former boyfriend of Mitchell.

Village Tavern security tapes show Tyrell Houfmuse entered the drinking establishment at 11:10 p.m. Anthony Asselin entered the bar twelve seconds later and approached Houfmuse. Less than one minute later, Houfmuse exited the bar, followed immediately by Asselin and a group of men.

After the shooting, City of Kennewick Police Department Corporal Todd Dronen recovered six shell casings at the scene. Dronen noticed three divots on the parking lot pavement that could have been caused by bullets.

Anthony Asselin suffered three gunshot wounds, one to his chest with no exit wound, one to his abdomen with an exit wound, and a superficial wound to his left

6

elbow. The two bullets to the torso entered Asselin's front side. Asselin now suffers complete paralysis from the fourth thoracic vertebrae down.

After the shooting, Tyrell Houfmuse and Aquarius Gibbs traveled to Hermiston. The Kennewick Police Department issued an arrest warrant for Houfmuse. Oregon law enforcement eventually found Houfmuse in a Hermiston apartment and transported him to the Umatilla County jail for extradition.

While in the Oregon jail, Houfmuse called R'Kiesha Smith. Houfmuse knew not that the jail recorded the call. During the call, Houfmuse repeatedly rambled about how Anthony Asselin and his friends assaulted Houfmuse's brother. According to Houfmuse, he would not permit anyone to harm his brother. He commented that he can fight Asselin and his associates. Houfmuse complained of continuous death threats from Asselin and noted the need for protection. He stated that the security video from the Village Tavern will show that Asselin pursued him.

## PROCEDURE

The State of Washington charged Tyrell Houfmuse with assault in the first degree and unlawful possession of a firearm in the second degree based on the earlier felony conviction. Tyree Houfmuse asserted self-defense to the charge of assault. He asserted no defense of necessity to the charge of unlawful possession of a firearm.

The State called multiple witnesses, including Aquarius Gibbs, Felicia Richardson, Ariel Mitchell, Dr. Steven Kincaid, the victim's mother Tammy Gill, and Kennewick

7

Police Department Corporal Todd Dronen. Houfmuse testified in his own defense.

During closing argument, Tyree Houfmuse's counsel attacked the credibility of all percipient witnesses other than Houfmuse. According to counsel, Aquarius Gibbs obviously lied because of fear and wanting to protect herself from retaliation by Anthony Asselin. According to defense counsel, Felicia Richardson lied because she was Anthony Asselin's girlfriend. Richardson's testimony was incredible because she declared that Houfmuse shot Asselin from the rear, but Dr. Steven Kincaid testified the bullets entered Asselin's front such that Houfmuse shot Asselin from the front. Ariel Mitchell's testimony lacked value because she did not view the fight until after she heard gunshots. Also, Mitchell was a former girlfriend of Anthony Asselin and the current girlfriend of a cousin of Asselin. Mitchell repeatedly altered her story.

Defense counsel, during closing, argued that the physical evidence confirmed the testimony of Tyree Houfmuse that he grabbed the gun from Anthony Asselin. Three divots in the pavement confirmed use of the gun by Asselin before Houfmuse seized the weapon and fired his three shots. Counsel also painted Houfmuse as a credible witness who firmly answered the questions of the State's counsel during cross-examination.

The jury found Tyrell Houfmuse not guilty of assault, but guilty of unlawful possession of a firearm in the second degree. The court sentenced Houfmuse to twenty months' confinement.

8

## LAW AND ANALYSIS

Tyrell Houfmuse contends that facts supported a defense of necessity to the charge of unlawful possession of a firearm and his defense counsel's failure to assert necessity as an affirmative defense to this charge constituted deficient performance. Houfmuse further contends that, but for his counsel's failure to raise necessity as a defense, he would have been acquitted on the charge. The State disagrees with all three of Houfmuse's contentions and argues that defense counsel made a tactical decision not to bring a necessity defense to the unlawful possession charge because it would undermine Houfmuse's self-defense theory asserted in response to the assault charge, the more serious of the two charges.

We first review whether sufficient facts supported a defense of necessity such that the jury should have been instructed on the defense if Houfmuse requested an instruction. For one to show ineffective assistance of counsel for failing to request a jury instruction, the defendant must establish entitlement to the instruction. *State v. Johnston*, 143 Wn. App. 1, 21, 177 P.3d 1127 (2007). We later analyze whether Houfmuse suffered ineffective assistance of counsel by reason of his trial counsel's failure to advance the defense.

### Necessity Defense

The State charged and the jury convicted Tyree Houfmuse with felon in unlawful possession of a firearm. RCW 9.41.040 makes it illegal for a felon to possess a firearm.

9

In relevant parts, RCW 9.41.040 provides:

> (2)(a) A person . . . is guilty of the crime of unlawful possession of a firearm in the second degree, if the person does not qualify under subsection (1) of this section for the crime of unlawful possession of a firearm in the first degree and the person owns, has in his or her possession, or has in his or her control any firearm:
>
> (i) After having previously been convicted . . . in this state or elsewhere of any felony. . . .

Houfmuse agrees he was a felon when he shot Anthony Asselin and, at least momentarily, possessed a firearm. He asks that his behavior be excused because of the exigencies of the situation that confronted him. RCW 9.41.040 admits no defense.

Washington allows the defense of necessity even when the charging statute acknowledges no defense. *State v. Vander Houwen*, 163 Wn.2d 25, 33, 177 P.3d 93 (2008). The necessity defense is available to a defendant when the physical forces of nature or the pressure of circumstances cause the accused to take unlawful action to avoid a harm which social policy deems greater than the harm resulting from a violation of the law. *State v. Parker*, 127 Wn. App. 352, 354, 111 P.3d 1152 (2005); *State v. Gallegos*, 73 Wn. App. 644, 650, 871 P.2d 621 (1994). Stated differently, a defendant may assert necessity when circumstances cause him to take unlawful action in order to avoid a greater injury. *State v. Jeffrey*, 77 Wn. App. 222, 224, 889 P.2d 956 (1995); *State v. Diana*, 24 Wn. App. 908, 913-14, 604 P.2d 1312 (1979). The necessity defense's alternate labels are justification and self-defense. *United States v. Lemon*, 824 F.2d 763, 765 (9th Cir. 1987); *United States v. Harper*, 802 F.2d 115, 117 n.1 (5th Cir. 1986).

10

On three occasions, this court has held the necessity defense available in a prosecution for unlawful possession of a firearm. *State v. Parker*, 127 Wn. App. 352; *State v. Stockton*, 91 Wn. App. 35, 44, 955 P.2d 805 (1998); *State v. Jeffrey*, 77 Wn. App. at 224-25. In this setting, Washington has adopted the federal test announced in *United States v. Lemon*, 824 F.2d 763. *State v. Jeffrey*, 77 Wn. App. at 226. Under the federal rule, a defendant must establish by a preponderance of the evidence that (1) he was under unlawful and present threat of death or serious bodily injury, (2) he did not recklessly place himself in a situation where he would be forced to engage in criminal conduct, (3) he had no reasonable alternative, and (4) there was a direct causal relationship between the criminal action and the avoidance of the threatened harm. *United States v. Lemon*, 824 F.2d at 765; *State v. Jeffrey*, 77 Wn. App. at 224.

This court first addressed the necessity defense in the context of an unlawful possession of a firearm charge in *State v. Jeffrey*, 77 Wn. App. 222 (1995). Skip Jeffrey and his wife Kathy reposed at home, when Kathy gazed out the kitchen window and saw the face of a male. A startled Kathy awoke her husband, who instructed her to call the police. A sheriff deputy responded and searched the surrounding area. He found a young male in the neighborhood, but Kathy Jeffrey could not identify him as the person she saw. After the deputy departed, a friend visited the Jeffreys' home and placed a .45 mm. Llama handgun under the residence's couch. Thereafter the Jeffreys heard noises outside their bedroom window. Skip Jeffrey saw a silhouette outside the window, retrieved the

11

handgun from under the couch, and fired a shot oddly through the headboard of the bed. He then told his wife to call the police again. When the sheriff deputy returned, he found Skip Jeffrey in the bedroom with the gun in his hand.

Skip Jeffrey appealed from the trial court's denial of his request for a necessity defense jury instruction. The State responded that necessity is not available as a defense because unlawful possession of a firearm is a strict liability crime and the defense would frustrate the legislature's desire to prevent the possession of guns by convicted felons. This court disagreed based on the reasoning that the legislature did not intend for a person threatened with immediate harm to succumb to an attacker rather than act in self-defense. The criminal statute did not anticipate an unforeseen and sudden situation when an individual was threatened with impending danger.

Although the *Jeffrey* court adopted the necessity defense, the court affirmed the trial court's denial of a jury instruction because the facts did not support the defense. Therefore, the court's discussion of the validity of the defense could be considered dicta. The defense nonetheless failed because, even if a person appeared a second time, Skip Jeffrey did not encounter an imminent threat of bodily injury or death. No evidence indicated the stalker would immediately enter the home. Jeffrey's call to the police substituted as a reasonable alternative to use of the handgun.

In *State v. Parker*, 127 Wn. App. 352 (2005), a law enforcement officer, in April 2003, arrested Shamarr Parker on another offense, when the officer discovered a gun

12

magazine with bullets therein inside Parker's pants pocket. The magazine fit a gun found nearby, and Parker conceded he owned the gun. Parker contended he needed to carry the gun because assailants shot him the previous July and the assailants remained at large.

In *State v. Parker*, the trial court refused Parker's request for a jury instruction informing the jury of the necessity defense, and this court affirmed. We ruled that Parker failed to establish the first element of the defense. Since Parker was shot nine months earlier, he no longer remained under present threat. Parker also failed to prove that he lacked a reasonable alternative to carrying a gun, since he failed to contact police about the July shooting. Finally, we ruled that Parker failed to establish a direct causal relationship between his possession of a firearm and the avoidance of the threatened harm. This latter ruling could preclude the necessity defense in all cases except when the defendant grabs someone else's gun at the last moment before employing the gun.

In *State v. Stockton*, 91 Wn. App. 35 (1998), the State cross appealed the trial court's rendering of a jury instruction on Matthew Stockton's necessity defense in a prosecution for unlawful possession of a firearm. Stockton testified he walked from his apartment to the Time Out Tavern to play pool when a man approached him and asked him what he wanted. Stockton believed the man wished to sell him drugs. He told the man he wanted nothing and continued walking. Two other men approached him, asked him if he had money, and put their hands inside his pockets. Stockton punched one of the men, and the others returned punches on his head and body. After several minutes, he

13

saw a gun in someone's hand and grabbed it by the barrel. The gun fell to the ground.

Stockton retrieved the gun and pointed it in the direction of the crowd before he fled. He

hid in some bushes behind an apartment building, cocked the gun, and listened for voices

and footsteps. When police arrived, Stockton attempted to hide the gun because he was a

convicted felon. Because law enforcement spotted the gun, the State charged him with

unlawful possession of a firearm.

The Court of Appeals, in *State v. Stockton*, denied the State's cross appeal. The

State argued that the *Jeffrey* court erred when it declared the necessity defense available

in an unlawful possession of a firearm charge, since the legislature never crafted a

defense to the crime. The *Stockton* court confirmed the validity of the defense. Without

analysis, the court agreed that Stockton was entitled to a jury instruction on that defense.

We now ask whether the trial court should have delivered a jury instruction on the

necessity defense if Tyree Houfmuse asked for the instruction at the close of trial. The

State argues that, if this court disbelieves Houfmuse's story, the facts do not support the

defense. The State emphasizes that, during Tyree Houfmuse's prison telephone call, he

conceded he shot Anthony Asselin in retaliation for Asselin's attack on Houfmuse's

brother. The State also underlines that other evidence showed that Houfmuse procured a

gun before the Village Tavern altercation and that Houfmuse brought the gun to the

tavern. The State likens Houfmuse's predicament as the quandary one might face when

one spies a prowler's face through a window but the prowler does not seek immediate

14

entrance into the residence.

Contrary to the State's suggestion, we must view the evidence in the light favorable to Tyree Houfmuse when determining whether a necessity defense instruction would be given. *State v. Fernandez-Medina*, 141 Wn.2d 448, 455-56, 6 P.3d 1150 (2000); *State v. Buzzell*, 148 Wn. App. 592, 602, 200 P.3d 287 (2009). The defendant is entitled to have presented instructions relating to a theory of defense for which there is any foundation in the evidence, even though the evidence may be weak, inconsistent, or of doubtful credibility. *United States v. Lemon*, 824 F.2d at 764. We also observe that the jury believed Tyree Houfmuse's version of the facts since they acquitted him on the charge of assault.

Because we must view the evidence positively for Tyree Houfmuse, we disagree that Houfmuse directly acknowledged, during the Oregon jail phone call, that he shot Asselin in revenge. A listener could indirectly conclude Houfmuse shot in part in reprisal, but the telephone conversation rambles with slang and foul language, and Houfmuse also spoke of the need for protection from Asselin in part because of the attack on Houfmuse's brother.

We hold that Tyree Houfmuse's account of the events establishes the four elements of the necessity defense articulated in *State v. Jeffrey*. Houfmuse testified that he and Anthony Asselin were outside the tavern when Asselin pulled a gun on him. Asselin yelled and threatened him. A struggle ensued, during which Asselin discharged

15

the gun three times. After Houfmuse wrested the gun from Asselin, Asselin, with arms swinging, chased Houfmuse. Houfmuse shot behind him. When viewing the evidence in the light most favorable to Houfmuse, evidence suffices to show that Houfmuse acted under an unlawful and present threat of death or serious bodily injury, the first component of the four elements of the defense. The facts in our appeal resemble the facts in *State v. Stockton* more than the circumstances in *State v. Parker* and *State v. Jeffrey*.

Tyrell Houfmuse visited the Village Tavern because he believed Anthony Asselin would not be present. When Asselin arrived at the tavern, Houfmuse immediately found Aquarius Gibbs and told her they needed to leave. Asselin confronted Houfmuse in the bar. Houfmuse attempted to calm Asselin, and then Houfmuse walked outside in an attempt to leave. Asselin and his associates surrounded Houfmuse, and he could not escape. Thus, evidence favoring Houfmuse shows that he did not recklessly place himself in a situation that would force him to engage in criminal conduct, the second element of the necessity defense.

In order to show that a defendant lacked a reasonable legal alternative, our third ingredient, he must show that he tried the alternative or had no time to try it, or that a history of futile attempts revealed the illusionary benefits of the alternative. *United States v. Harper*, 802 F.2d at 118; *State v. Parker*, 127 Wn. App. at 355 (2005). Tyrell Houfmuse testified that he grabbed the gun only after Anthony Asselin pointed it at him. Houfmuse fled on seizing the gun. Nonetheless, Asselin ran after Houfmuse, swinging

his arms in a punching motion. As Houfmuse ran, he shot the gun behind him.

The State may assert that Tyree Houfmuse's alternatives to grabbing Anthony Asselin's gun and shooting Asselin included calling the police while in the bar or walking away while talking to Asselin in the parking lot. Under Tyree Houfmuse's version of the facts, however, neither alternative was reasonable. When Asselin arrived, Houfmuse attempted to depart, but Asselin and his friends stalled him. Any police response from an emergency call would have consumed minutes. Houfmuse was unaware that Asselin possessed a gun until Asselin pointed it at him. Once surrounded and at gun point, Houfmuse did not have time to call the police.

Our dissenting brother, not the State, writes that Tyree Houfmuse, once he seized Anthony Asselin's gun, had reasonable alternatives to shooting Asselin. According to the dissent, Houfmuse could have held the victim at gunpoint, could have reasonably retreated with the gun in hand, and could have ferried the gun to the police. Our brother, enamored and preoccupied with fiction such as JFK conspiracy theories and *Harry Potter*, ignores critical facts. After Houfmuse grasped the gun, he attempted to escape. Nevertheless, Asselin continued to pursue Houfmuse. Asselin appeared even angrier and aggressively advanced toward Houfmuse after the latter took the gun. Houfmuse was terrified because of Asselin's size and Asselin's earlier threats of death. Houfmuse only then fired the shots.

17

Ineffective Assistance of Counsel

We have concluded that the trial court would or should have delivered a jury instruction on the defense of necessity had Tyree Houfmuse asked for the instruction. Nevertheless, Houfmuse never asked for the instruction, so we will not reverse the conviction on the basis of trial court error. Generally, issues not raised in the trial court may not be raised for the first time on appeal. RAP 2.5(a); *State v. Nitsch*, 100 Wn. App. 512, 519, 997 P.2d 1000 (2000). An exception to this rule, under RAP 2.5(a), is manifest constitutional error, but Houfmuse does not assert manifest constitutional error. Instead, Tyree Houfmuse argues on appeal that his trial counsel performed deficiently by failing to assert a necessity defense and failing to request a jury instruction on the defense.

Asserting ineffective assistance of counsel on appeal frustrates the judicial process since the appellate court indirectly reviews an issue not brought to the attention of the trial court. The State may need to incur the cost of a second trial through no fault of its own. Nevertheless, the accused's right to competent counsel preempts efficiency of the judicial system. Guilt or innocence should not depend on the performance of the defendant's trial attorney. The constitution guarantees effective assistance of counsel in order to ensure that a defendant receives due process, because counsel helps ensure that the defendant presents a defense that furthers a fundamentally fair trial. *State v. Loher*, 398 P.3d 794 (Haw. 2017).

18

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). Washington courts have not extended the protections of the state constitution beyond the protections afforded by the United States Constitution. Instead, state decisions follow the teachings and rules announced in the United States Supreme Court's seminal decision of *Strickland v. Washington*, 466 U.S. 668 (1984). An accused is entitled to more than a lawyer who sits next to him in court proceedings. In order to effectuate the purpose behind the constitutional protection, the accused is entitled to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. at 686.

A claim of ineffective assistance of counsel requires a showing that (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defendant. *Strickland*, 466 U.S. at 687. If one prong of the test fails, we need not address the remaining prong. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996).

For the deficiency prong of ineffective assistance of counsel, this court gives great deference to trial counsel's performance and begins the analysis with a strong presumption that counsel was effective. *State v. West*, 185 Wn. App. 625, 638, 344 P.3d 1233 (2015). Deficient performance is performance that fell below an objective standard of reasonableness based on consideration of all the circumstances. *State v. McFarland*,

19

127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). The appellant bears the burden to prove ineffective assistance of counsel. *State v. McFarland*, 127 Wn.2d at 335. Courts cannot exhaustively define the obligations of counsel or form a checklist for judicial evaluation of attorney performance. *Strickland v. Washington*, 466 U.S. at 688 (1984). Nevertheless, effective representation entails certain basic duties, such as the overarching duty to advocate the defendant's cause and the more particular duty to assert such skill and knowledge as will render the trial a reliable adversarial testing process. *Strickland v. Washington*, 466 U.S. at 688; *In re Personal Restraint of Yung-Cheng Tsai*, 183 Wn.2d 91, 100, 351 P.3d 138 (2015).

The State astutely relies on the principle that trial strategy and tactics cannot form the basis of a finding of deficient performance. *State v. Johnston*, 143 Wn. App. at 16 (2007). The defendant must show in the record the absence of a legitimate strategic or tactical reason supporting the challenged conduct of omission by counsel. *State v. McFarland*, 127 Wn.2d at 336. Imposing the burden on the defendant invents problems since the imposition requires the defendant to prove a negative. Presumably the defendant must fashion straw men or women and then dissemble them. In practice, the State typically posits one or more reasons for a tactical decision. The Supreme Court nonetheless remains firm that no presumption of ineffective representation exists. *State v. McFarland*, 127 Wn.2d at 336. Thus, in the end, the defendant holds the burden of showing a lack of a legitimate strategy.

20

The State in this appeal pictures a conflict between the defense of necessity for the unlawful possession charge and self-defense for the assault charge such that, for tactical reasons, trial counsel chose one over the other. According to the State, asserting the defense of necessity would emphasize Tyree Houfmuse's version of events, when all other witnesses disagreed with his account of the facts. The jury would need to adopt Houfmuse's highly unlikely version of the shooting since no one else testified that they saw Asselin with a gun and Houfmuse taking it from him. The jury would need to find that Tyree Houfmuse brought no gun to the Village Tavern and instead grabbed the gun from Anthony Asselin. Accordingly, trial counsel rendered a strategic choice of asserting self-defense to the assault charge and foregoing the necessity defense and thereby risked the conviction of unlawful possession of a firearm, a lesser crime. The defense attorney wanted to demonstrate that the defendant was so afraid of the victim that he armed himself in advance of a chance encounter at a bar.

An argument that trial strategy informed trial counsel's performance does not end our inquiry. Not all defense counsel's strategies or tactics are immune from attack. *In re Personal Restraint of Caldellis*, 187 Wn.2d 127, 141, 385 P.3d 135 (2016). A criminal defendant can rebut the presumption of reasonable performance by demonstrating that no conceivable legitimate tactic explains counsel's performance. *In re Personal Restraint of Caldellis*, 187 Wn.2d at 141; *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004). The relevant question is not whether counsel's choices were strategic, but

21

whether they were reasonable. *Roe v. Flores-Ortega*, 528 U.S. 470, 481, 120 S. Ct. 1029, 145 L. Ed. 2d 985 (2000); *State v. Grier*, 171 Wn.2d at 34 (2011).

We cannot be sure if trial defense counsel knew of the possibility of asserting the necessity defense or if he rendered a conscious decision to withhold the defense. We cannot divine the reason for refusing to forward the defense, assuming counsel exercised a deliberate choice. We do not ask counsel to respond to the charge of ineffective assistance of counsel because we do not address facts outside the record in a direct appeal.

We disagree with the State and conclude that no reasonable trial strategy explains defense counsel's failure to request a necessity defense instruction on the unlawful possession of a firearm charge. Tyrell Houfmuse's counsel was not required to choose between arguing self-defense for one crime and the defense of necessity for the second crime. The two defenses were consistent. In fact, courts have likened the necessity defense to self-defense. *State v. Jeffrey*, 77 Wn. App. at 224-25 (1995); *United States v. Harper*, 802 F.2d at 117 n.1. The elements of both overlap.

The State's line of argument assumes that trial counsel decidedly worried that the jury would not believe his client, and, thus, counsel did not wish to emphasize Tyree Houfmuse's version of the assault. We agree with the State that none of the other witnesses supported Tyree Houfmuse's claim of self-defense to the assault charge. The other two purported eyewitnesses averred that Houfmuse pulled a gun from his person

22

and shot Anthony Asselin as Asselin withdrew from the confrontation. Nevertheless, downplaying Houfmuse's testimony in deference to other witness's testimony served no purpose in resisting the assault charge. To win on the charge of assault, the jury needed to believe Houfmuse's testimony. Attacking the credibility of other witnesses and bolstering the credibility of Houfmuse presented the only reasonable strategy for the entire case. The defense of necessity to the charge of unlawful possession of a firearm dovetailed rather than undercut the defense of self-defense to the charge of assault.

The dissenting opinion suggests that the jury would necessarily have believed that Tyree Houfmuse brought the gun to the Village Tavern because Houfmuse would be foolish not to leave home unprepared to defend himself if he feared that Anthony Asselin would shoot him. Once again, the dissent adopts fiction. Tyree Houfmuse did not anticipate encountering Asselin at the tavern. Houfmuse went to the Village Tavern because Asselin was not known to patronize the tavern. Houfmuse possessed no reason to arm himself.

The State's line of argument also conflicts with what occurred at trial. Competency of counsel is determined based on the entire record below. *State v. McFarland*, 127 Wn.2d at 335 (1995). We reviewed the closing argument of Tyree Houfmuse to determine if counsel adopted the tactics proposed by the State. Defense counsel, during closing argument, promoted the truthfulness of Tyree Houfmuse and vigorously attacked the credibility of the other witnesses to the shooting. Counsel

23

accused Felicia Richardson and Ariel Mitchell of lying. Defense counsel never argued that Houfmuse's fear of Anthony Asselin led him to arm himself in advance of visiting the Village Tavern. Based on the actual performance of defense counsel, we necessarily conclude that downplaying the discrepancy between Houfmuse's version of the facts and others' version of the facts was not a strategy, let alone a reasonable strategy.

Our dissenting brother writes that trial counsel cannot be faulted for failure to anticipate a potential defense to an uncharged theory created after trial by appellate counsel. This statement fails to recognize that the State charged Tyree Houfmuse with unlawful possession of a firearm and the facts supported a conviction regardless of whether the jury believed Houfmuse brought the gun to the Village Tavern or accepted Houfmuse's own testimony that he grabbed the gun from Anthony Asselin during the confrontation. The dissent's quotes from the State's opening statement and closing summation do not exclude for consideration by the jury Houfmuse's seizure of the weapon from Asselin's person. The State never conceded or suggested to the jury that Houfmuse could not be convicted of unlawful possession by his snatching Anthony Asselin's firearm. Defense counsel should have anticipated and prepared a necessity defense, which defense matched his client's testimony.

The jury found Tyree Houfmuse credible because it acquitted him of the assault charge. In other words, the jury probably believed that Houfmuse took the gun from Anthony Asselin after a struggle with Asselin. Under these facts and without the

24

assertion of the necessity defense, the jury needed to convict Houfmuse of unlawful possession of a firearm.

The dissenting opinion suggests that fleeting possession, not necessity, loomed as the appropriate defense. Nevertheless, our state high court has never adopted fleeting possession as a defense to a firearm possession charge. Two decisions cited by the dissent, *State v. Callahan*, 77 Wn.2d 27, 31, 459 P.2d 400 (1969) and *State v. Spruell*, 57 Wn. App. 383, 386, 788 P.2d 21 (1990), involve unlawful possession of a controlled substance, not a weapon. *State v. Summers*, 107 Wn. App. 373, 383-87, 28 P.3d 780 (2001), the third decision cited by the defense, entailed a charge of unlawful possession of a firearm, but the court affirmed the trial court's denial of a jury instruction on momentary handling of a gun.

Other considerations thwart the dissent's employment of a fleeting possession defense as a reason to approve the conduct of trial counsel. First, the dissent fails to analyze whether firing a firearm can constitute fleeting possession. The legislature probably created the crime of felon in possession in order to preclude felons from use of a firearm. Thus, Tyree Houfmuse's use of Anthony Asselin's gun conflicts with a fleeting possession defense. Second, even if fleeting possession is a defense, the defense would not preclude the raising of the defense of necessity. The two defenses are not mutually exclusive. A competent defense counsel raises all applicable defenses. Any availability of the defense of fleeting possession does not excuse trial counsel's failure to assert the

25

necessity defense, but only creates a second ground on which counsel performed deficiently.

We also conclude that trial counsel's ineffectiveness prejudiced Tyree Houfmuse. Under *Strickland*, the defendant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland v. Washington*, 466 U.S. at 669.

To convict Tyrell Houfmuse of unlawful possession of a firearm in the second degree, the jury needed to find Houfmuse knowingly had a firearm in his possession or control on November 26, 2014, he had previously been convicted of a felony, and he possessed the firearm while in Washington. RCW 9.41.040. Houfmuse's own testimony established all of these elements. Accordingly, Houfmuse's only hope of acquittal on this charge would be an affirmative defense. Defense counsel did not advocate a defense or attempt to dissuade the jury from a conviction on this charge.

Without a necessity instruction, the jury could not weigh the mitigating circumstance that Houfmuse needed to grab and fire the gun in order to defend himself against the unlawful threat of death or serious injury. Based on the total record, a reasonable probability exists that the jury's finding of guilt on the unlawful possession charge would have been different if defense counsel requested a jury instruction of necessity. After weighing Tyrell Houfmuse's account of the events with conflicting

testimony from the other witnesses, the jury weighed the credibility and ultimately acquitted Houfmuse of the assault charge because of self-defense. The jury accepted Houfmuse's version of the confrontation. If the jury had the opportunity to review a necessity defense, it would have weighed the same evidence it used to acquit Houfmuse on the assault charge. Accordingly, if defense counsel had not rendered deficient performance by failing to request a jury instruction of necessity, Houfmuse would likely have been acquitted of the unlawful possession charge.

## CONCLUSION

We hold that trial counsel performed ineffectively by failing to raise the defense of necessity to the charge of unlawful possession of a firearm. We hold that ineffective assistance of counsel prejudiced Tyree Houfmuse. We remand for a new trial on the charge of unlawful possession.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, C.J.

I CONCUR:

_____
Pennell, J.

27

No. 34394-4-III

KORSMO, J. (dissenting) — It is a great curiosity to me that defense counsel is adjudged to be ineffective for not presenting a defense to a fictitious theory of the case that was neither charged by the prosecutor nor argued at trial by either party. The Sixth Amendment measures effective assistance by adjudging counsel's performance at trial, not counsel's failure to anticipate a potential defense to an uncharged theory *created well after the trial* by defendant's appellate counsel. I dissent.

There are two major problems with the majority's theory of the case. The primary problem is that it involves a defense to the wrong crime, one that was never charged. The second problem is that, even if the charging theory for the unlawful possession of a firearm (UPF) count had involved the defendant's alleged wresting of the weapon away from the victim, necessity would not have been the proper defense to that count. A fleeting possession defense would have been appropriate. The newly suggested defense to the uncharged crime, as the prosecutor duly notes in his briefing, also would have undercut the defendant's successful defense to the far more serious charge of first degree assault. Defense counsel understandably would not have pursued this approach even if it had been available.

No. 34394-4-III
*State v. Houfmuse—Dissent*

The very first words out of the prosecutor's mouth in opening statement described the State's theory on the UPF count:

> Your Honor, if it may please the Court, counsel, ladies and gentlemen, this case is about the defendant taking a gun to a possible—I want to emphasize that—a possible fistfight. The defendant shot another person who was unarmed and who was not actually fighting with him, but he shot him three times resulting in that man, the victim, having a paralysis that's going to be lifelong.

Report of Proceedings (RP) at 103. Similarly, the prosecutor's closing argument only focused on defendant's possession of the firearm prior to his arrival at the tavern:

> On the second count, unlawful possession of a firearm, I don't think there's too much of a dispute. He did have a felony conviction. He did have a gun, although he basically denied it. He did talk about getting protection. Aquarius Gibbs saw—saw him with a gun. She talked about—talked about him, you know, possibly having a gun on that date. I'm just asking you to hold the defendant accountable; hold him accountable.

RP at 446. This behavior was that also charged by the State, which alleged that Mr. Houfmuse did "own or have in his/her possession or control" a firearm.[1] Clerk's Papers (CP) at 2, 8. The court accordingly instructed the jury on the meaning of those elements:

> Possession means having a firearm in one's custody or control. It may be either actual or constructive. Actual possession occurs when the item is in the actual physical custody of the person charged with possession.

---

[1] It is also the only theory that the State could have charged since, up until the time the defendant testified that he took the gun away from the victim and used it on him, there was no evidence that the defendant had claimed to have done so. The prosecutor's selection of the act he was relying on left that theory the only one before the jury. *State v. Petrich*, 101 Wn.2d 566, 572, 683 P.2d 173 (1984).

2

> Constructive possession occurs when there is no actual physical possession but there is dominion and control over the item.

CP at 77. Another instruction of interest is number 13 defining "necessary" for purposes of self-defense. CP at 72. That instruction listed two elements for an action to be necessary: (1) no reasonably effective alternative existed to using force and (2) the amount of force used was reasonable. *Id.*

It should be very elementary criminal law that the prosecutor files a charge and notifies the defendant, who prepares a defense to that charge. Both sides present their evidence, the judge instructs the jury on the applicable law, and the jury determines if the prosecutor has proved the case beyond a reasonable doubt. However, the appellant's theory in this appeal challenges quite a few of these basic assumptions.

Here, according to the appeal, Mr. Houfmuse's attorney should have ignored the State's theory of the case on the UPF charge in favor of an uncharged theory—that Mr. Houfmuse might have been guilty of UPF for taking the victim's gun away from him. In addition to ignoring the theory that was being presented to the jury by the prosecutor, this approach also puts the defendant in the position of taking over the prosecutorial function to select the charge(s) to be filed.[2] The defendant also bears the burden of establishing

---

[2] In the interests of completeness and competency, I imagine it also would have been prudent for defense counsel to put on a defense to the killing of President Kennedy and other uncharged offenses for which Mr. Houfmuse might have a defense. Having read the Warren Report (condensed single volume edition), I believe Oswald, not Houfmuse, shot the President. However, the majority's approach to charging documents

3

the defense of necessity by a preponderance of the evidence. *E.g.*, *State v. Gallegos*, 73

Wn. App. 644, 651, 871 P.2d 621 (1994); 11 WASHINGTON PRACTICE: WASHINGTON

PATTERN JURY INSTRUCTIONS: CRIMINAL 18.02, at 292 (4th ed. 2016) (WPIC). Thus,

pursuing a necessity defense to the uncharged UPF theory would have put the defense in

the position of disproving that new theory. It might be the first time in American

criminal jurisprudence that a criminal defendant both charged and bore the burden of

disproving the offense against him. Most certainly it is the first time a defense attorney

has been ruled ineffective for not undertaking the prosecutorial function in order to

defend a criminal case.

But, even if it had made sense to argue and attempt to establish a defense to an

irrelevant theory of liability, there are a few reasons that defense counsel would not do so

in this instance. For one thing, it would make no sense to argue a second theory of

liability. Since the defense theory that Mr. Houfmuse had not brought a gun to the bar

presented a defense to the State's theory of the case, there was absolutely no reason to

present the specter of a second theory of guilt that was not being pursued by the State.

Secondly, the impromptu arming self-defense theory of the case was inconsistent

with a necessity defense. After spending most of the trial establishing the victim's

dangerousness, any rational jury would think Mr. Houfmuse foolish in the extreme to

---

suggests competent counsel must defend against all uncharged offenses as well.

leave home unprepared to defend himself against a gun-wielding foe if he genuinely believed that foe would shoot him. This factual problem would undercut the credibility of his whole story.[3]

Third, raising a necessity defense presented serious potential for confusion with the jury. As noted in the court's instructions on self-defense, the two defenses have competing definitions of "necessity" or "necessary" that could easily have resulted in jury confusion. While the State had the burden of disproving self-defense, including the burden of disproving the necessity of defendant's action, that burden was flipped on the necessity defense to the UPF. Even more critically, one of the elements of a necessity defense is that no reasonable, lawful alternative existed. *Gallegos*, 73 Wn. App. at 651; WPIC 18.02. There were numerous *reasonable* alternatives to possessing the firearm once the defendant grabbed the gun. He could have held the victim at gunpoint. He could have taken it to the police. He could have reasonably retreated with the gun in hand. He could have thrown it away. Each and every one of these reasonable alternatives was inconsistent with using the weapon in self-defense. Pursuing a necessity defense could easily have led to the jury comparing the two potential approaches to

---

[3] The majority speculates that the acquittal means the jury found the defendant credible. It does not. The acquittal simply means that the State failed to prove some aspect of its case. There was no special interrogatory concerning self-defense, so there is not even a basis for concluding that the jury believed defendant's theory of the case. At most, the verdict suggests the State may have failed to disprove self-defense.

5

"necessary" behavior, possibly to the defendant's detriment on the far more serious charge.

I suspect if trial counsel had attempted to defend on such a foolish basis, the question presented by this appeal would have been whether he rendered ineffective assistance in doing so. If the two charged crimes were equally serious in terms of punishment, then counsel might well have pursued some affirmative defense to the UPF charge.[4] That was not the case in this instance. First degree assault is a level 12 offense, with Mr. Houfmuse facing a standard term of 138-184 months due to his offender score of five. RCW 9.94A.510, .515. The UPF charge, a level 3 offense, presented only a range of 17-22 months. *Id.* Counsel understandably focused on the defense to the significantly more serious crime and would not have wanted to undercut self-defense by raising a necessity defense to the charged UPF theory.

I also disagree that necessity was the appropriate way to defend against the defendant's uncharged theory of UPF resulting from the wresting of the gun from the victim. Since the defendant was not the owner of the weapon and allegedly possessed it only long enough to shoot the victim, the defense of fleeting possession would have been the more appropriate defense. Our courts recognize that momentary possession is not

---

[4] As stated in one of Mrs. Figgs' aphorisms: "There's going to be hell to pay, we might as well be hanged for the dragon as an egg." ROWLING, J.K., HARRY POTTER AND THE ORDER OF THE PHOENIX at 21 (2003).

6

sufficient to establish dominion and control over the property of another. *State v. Callahan*, 77 Wn.2d 27, 31, 459 P.2d 400 (1969); *State v. Summers*, 107 Wn. App. 373, 383-387, 28 P.3d 780 (2001); *State v. Spruell*, 57 Wn. App. 383, 386, 788 P.2d 21 (1990). The use of this defense in an unlawful firearm possession case was discussed at length in *Summers*, leading to the following summary:

> Possession is more than passing control. Momentary handling, without more, is insufficient to prove possession. But evidence of momentary handling, when combined with other evidence, such as dominion and control of the premises, or a motive to hide the item from police, is sufficient to prove possession. Finally, even passing control of contraband is not legal; it is merely insufficient to prove possession.

107 Wn. App. at 386-387.[5] If there had been a need to raise any other defense, fleeting possession rather than necessity was the way to go.

It is incomprehensible to me that a review of the entirety of this case can lead anyone to think that, considered as a whole, trial counsel rendered constitutionally defective assistance in violation of the Sixth Amendment. Despite the fact that he successfully pursued a theory of self-defense on the greater crime that saved the defendant from at least an additional decade in prison, the majority nevertheless wants to

---

[5] The majority faults *Summers* for not being decided by the Supreme Court and suggests that its rejection of the fleeting possession instruction means the defense is not applicable to firearm cases. *Summers* could have shortened its analysis significantly by saying the defense was unavailable if it had been so inclined. However, fleeting possession is a defense to *possession* offenses. The *Summers* discussion was used to reverse a UPF conviction for insufficient evidence in *State v. Blakeway*, noted at 109 Wn. App. 1066 (2002).

7

hang defense counsel out to dry for bar discipline for rendering ineffective assistance on a throwaway charge due to alleged incompetence.[6] RPC 1.1. I defy anyone to read this trial record and conclude that counsel was incompetent. He was not.

The conviction should be affirmed. I dissent.

_____
Korsmo, J.

---

[6] Another problem is that counsel will never even get to defend his handling of the case. We do not know what marching orders counsel was proceeding under from his client concerning the goal of the trial representation. This case would have been more fairly and actually decided in a personal restraint petition where counsel could have been compelled to discuss strategy and tactics.