IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 31517-7-III |
| Respondent/Cross-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL LYNN WEST, JR., | ) | PUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, J. — We address a common argument of a criminal defendant on appeal: his trial attorney provided ineffective assistance of counsel in violation of his constitutional rights. The argument arrives in a new setting. Michael West complains of his trial counsel's failure to ask the trial court, in addition to the jury, to acquit him by reason of insanity. He also faults trial counsel for failing to object to prejudicial and misleading testimony. We affirm Michael West's convictions for assaulting cellmates because any of trial counsel's deficiencies did not prejudice him.

FACTS

According to one examining psychiatrist, Michael Lee West is the most dangerous man he ever evaluated. In 2004, West attacked and killed his cellmate, Christopher Rentz, while awaiting trial for raping his girlfriend. For his crimes, West was

incarcerated at the Walla Walla State penitentiary. His violence did not end with confinement in the penitentiary, and, upon a transfer to another prison, he brutally assaulted two other cellmates. Those assaults give rise to this prosecution.

At the Walla Walla penitentiary, Michael West became "clearly [and] unequivocally psychotic." Report of Proceedings (RP) at 466. "He started talking about the coming of Christ." RP at 466. He claimed to be a prophet of God. He boasted that God taught him Hebrew and that God paid Barack Obama $4 million to spring him from prison. West believed Barack Obama would arrive in a limousine to drive him home. West stayed awake for days chanting and declaring himself to be one of the kings of the twelve tribes of Israel. West told other prisoners that Israelis paid $400,000 for his release so they could return him to Israel to serve as one of their kings.

To quell Michael West's psychosis, Department of Corrections (DOC) physicians prescribed a hefty dose of antipsychotic medication. West calmed enough to work with knives in the penitentiary kitchen, but he continued to proclaim he was a prophet of God.

DOC adjudged Michael West sufficiently stable to transfer him to Airway Heights Corrections Center, a long-term minimum security prison. Before he left the state penitentiary, West announced his intention to cease imbibing medications since he was not mentally ill. West discontinued medications on September 28, 2010, twelve days before the brutal assaults.

2

On October 1, 2010, DOC transferred Michael West from Walla Walla to Airway Heights. He told staff at Airway Heights that he was not mentally ill nor under treatment. At Airway Heights, West shared a cell with Chad Bolstad and Gary Welch.

Around 10:00 p.m. on October 10, 2010, Airway Heights prison officers locked inmates into their cells for the evening. Chad Bolstad then beaded a necklace, while seated on his bunk. Gary Welch read a book. Michael West sat on the toilet when he looked toward Welch and said: "[W]orship me like I'm God. I just want to know what it feels like." RP at 264. Welch said, "no." RP at 264. West urged him, "[c]ome on, please. I just want to know what it feels like." RP at 264. Welch responded, "Okay. You are God." RP at 264.

Michael West then looked at Chad Bolstad and said, "[w]orship me like I am God or I will smash you in the face." RP at 264. Before Bolstad could respond, West sprung from the toilet. With one hand, West pulled Bolstad's hair. With the other hand, West repeatedly punched Bolstad in the face. West threw Bolstad to the floor, smashed his head into the floor, and strangled Bolstad. West then pushed his fingers into Bolstad's eye sockets and, in a demented voice, repeated "give me the apple." RP at 266.

Gary Welch jumped off his bunk to stop Michael West from attacking Chad Bolstad. West turned to Welch and said, "[g]et on the bunk, bitch, or I'll kill you." RP at 267. Fearing for his life, Welch complied. But when West began to remove Chad Bolstad's eyeballs, Welch mustered the courage to rush by West and press the button to

3

open the cell door. The door would not open.

Michael West turned his attention to Gary Welch. West said: "I'm going to give you two choices. You either slit your own wrists, or I'm going to do the same to you." RP at 268. Welch asked for the razors. As West retrieved the razors, Welch ran to the door and screamed as loud as he could.

Airway Heights correction officers heard screaming in the cell of Chad Bolstad, Gary Welch, and Michael West. As officers arrived at the cell, West choked Welch, first with a towel and then his hands. West also pressed his fingers into Welch's eyeballs. Welch pleaded with officers to open the door. Officers ordered West to release Welch and to lie down on the ground. West asked: "[a]re you my God? If you tell me you're my God, I will obey your command." RP at 128. The officers refused to play god and again ordered West to lie down. West complied.

When Michael West laid down, Welch rushed to the cell door, which officers finally opened. Officers then saw blood pooling around Chad Bolstad's limp body. Bolstad sustained significant trauma to his face, including lacerations, abrasions, and significant bleeding in his left eye. His right eyeball laid on his cheek.

Airway Heights correction officers ordered Michael West to lie under his bunk. West complied and officers removed Bolstad, put him on a backboard, and carried him to the infirmary. Later, an ambulance scurried Bolstad to Spokane's Sacred Heart Medical Center.

4

Back in the cell, Michael West told Corrections Officer Bradley Saari that he was Lucifer, and he ordered Saari to kill everyone. Other officers donned protective gear to remove West from the cell, while West cleaned blood from the floor, walls, and sink with sheets and blankets.

Corrections officers moved Michael West from his cell and to the segregation unit. During the move, West screamed and raved incoherently about God, Satan, archangels, and President Barack Obama. At one point, he kneeled and prayed in what sounded like Hebrew.

The following day, a corrections officer overheard another inmate ask Michael West why he was in solitary. West explained, "I killed my cellie and [plucked] his [fucking] eyes out . . . my cellie is a child molester, child molesting mother . . . 666." RP at 217-18.

Chad Bolstad lost sight in both his eyes.

## PROCEDURE

After the attack on his cellmates, Michael West underwent several evaluations and was placed on antipsychotic medication. After several continuances to evaluate his competency, the trial court found Michael West competent to stand trial. The State of Washington then arraigned West on first and second-degree assault charges. West pled not guilty by reason of insanity.

5

In February 2013, the State tried Michael West before a jury. Gary Welch, Chad Bolstad and numerous Airway Heights correctional officers testified for the prosecution.

Michael West presented one witness, psychologist Kenneth Muscatel, PhD, to testify about West's competency. After earlier interviewing West, Dr. Muscatel diagnosed him with schizoaffective disorder, antisocial personality disorder, and persecutory ideation. In an amusing attempt to simplify the psychiatric terms, Muscatel explained:

> [Schizoaffective disorder is] a psychotic disorder that has both schizophrenic and affective mood components . . . [including] some bipolar features, mood lability up and down, and has schizophrenic disturbances in thinking and interpersonal relationships and in reality testing . . . when you combine the two, you can get an individual who may . . . superficially seem . . . less psychotic, but, in fact, . . . can be very much prone to mood instability and reactivity.

RP at 412.

During his trial testimony, Kenneth Muscatel explained that legal insanity requires more than mental illness. The mental illness must render the person incapable of understanding the nature and quality of his or her actions *or* unable to understand the wrongfulness of his or her conduct. RCW 9A.12.010. Dr. Muscatel testified that, despite Michael West's mental illness, he had no doubt that West "understood the nature and quality of his actions." RP at 417. Muscatel encountered difficulty, however, in determining whether West understood the wrongfulness of his conduct at the time of the assaults. Muscatel explained why:

6

> In terms of legal insanity, the second, that prong has to be met connecting the mental disorder, how the mental disorder impacts the individual and their understanding of the wrongfulness of their conduct.
>
> . . . .
>
> [West] doesn't remember big chunks of what happened. He talked about a lot of circumstantial factors, factors that described his mental disorder and thinking in general at the time. He couldn't tell me very specifically why he acted specifically the way he acted at the time and what he was thinking and feeling. Therefore, that's a bit of a blank spot. So what I indicated in my report was that because he couldn't tell me what he was thinking, didn't make specific statements that references specific thoughts, I couldn't opine conclusively that he was unable to understand and appreciate the wrongfulness of his conduct at that time.
>
> . . . .
>
> All I can say is that based upon the information that I reviewed, his actions appeared to be the result of his mental disorder. That's as far as I would go in that regard.

RP at 418-23.

On cross-examination, the State of Washington questioned Kenneth Muscatel from his report. In the report, Muscatel wrote, "it can be debated whether the content of Mr. West's delusions and hallucinations are a close enough fit to the wrongfulness prong of the NGRI [not guilty by reason of insanity] statute." RP at 446. Dr. Muscatel explained, "[b]ecause Mr. West cannot tell me what he was thinking at or around the moments of these egregious assaults, and did not make specific statements that referenced his specific thoughts as he instituted the attacks, I cannot opine conclusively he was unable to understand and appreciate the wrongfulness of his conduct at the time." RP at 447-48.

7

The State called William Grant, MD, to rebut Kenneth Muscatel's testimony.

Despite the fact that Michael West told Muscatel he could not remember the cell attacks,

he earlier provided two accounts of the melee to Dr. Grant. He told Grant he could

"remember everything." RP at 470. At trial, Grant recited the account West provided:

> [West] was in a cell with a Native American who was doing bead work. Mr. West attempted to bring him to Christ, but the Native American was not interested and would not cooperate.
> Mr. West made the point that people make material things and then worship them, but the Native American did not see interest in it. Mr. West flicked him in the face with his fingers and the fight began. "After I flicked him, everything went black." He saw his hand reach out and grab the Native American by the throat and force him to the ground. He remembers saying, "Call me your God." He reached out and took one eye out and then said "give me the other." After attacking the remaining eye, he stood up and said, "I'm Lucifer, the Great." He remembers instructing the other inmate—there was another assault, another fellow in the cell, too—the other inmate in the cell to say I'm your God and directing him to kiss his feet. He remembers choking the second inmate with his right arm, but does not remember wrapping a towel around his neck.
> Shortly after that, the officers arrived.

RP at 471.

Based on Michael West's and others' accounts of the assault, Dr. Grant concluded

by a preponderance of the evidence that West appreciated the nature and quality of his

actions and also knew right from wrong when he attacked Chad Bolstad and Gary Welch.

When asked to support his conclusion, Dr. Grant explained:

> First, if he was taking directions or orders or was controlled by Lucifer, Lucifer is an evil person and Lucifer's commands are wrong.
> Second, he blinded a man because he wouldn't worship him. You can say—or can you say, I deserve to be worshiped; I will take vengeance

8

on those who do not worship me, and you take your vengeance. Does that make it right? I don't think so. Society would not justify what he did on any of the grounds that he offered to explain what he did. And, therefore, I believe that he knew what he was doing was wrong.

RP at 478.

If the jury determined Michael West was legally insane at the time of the assault, it needed to also decide whether he should be confined or freed. *See also* RCW 10.77.040. Therefore, after discussing Michael West's sanity with William Grant, the State of Washington posed questions to Dr. Grant on the danger West posed. West contends his counsel should have objected to this testimony because it was prejudicial. Dr. Grant testified:

> Q    Dr. Grant, do you have an opinion as to whether or not Mr. West is a substantial danger to other persons unless kept under further control by the court or persons or institutions?
> A    He is terribly dangerous. Sane or psychotic, this is the most dangerous person—I believe he is the most dangerous person I have ever evaluated in my life.
> Q    And do you have an opinion as to whether or not Mr. West presents a substantial likelihood of committing criminal acts jeopardizing public safety or security unless he is kept under further control by the court or other persons or institutions?
> A    Yes, I do.
> Q    What is that opinion?
> A    The best predictor of future behavior is past behavior. We know his pattern. If you were a church-going person, a devoutly religious person last year, you're probably a devout religious person this year and probably going to be a devout religious person next year. If you were a violent, dangerous person in the weeks or years or months before an incident, you're violent during the incident, you're very likely to continue this pattern of violence throughout your life.

9

Q      Dr. Grant, do you have an opinion as to whether or not treatment by detention in a state facility instead of a less restrictive treatment is in the best interest of the defendant and others?

A      State facility, you mean a hospital?

Q      Or other institution.

A      Well, he—you couldn't have in a hospital. We had him in a hospital and we had him in a hospital when he wasn't psychotic. He had already committed the murder and we had to seclude him. We couldn't let him out. He didn't like seclusion. He threatened anybody who came near him or put their hands through the door. He bruised his hand or cut his hand or something and a nurse was trying to treat his hand and told her "you better stay back, because I'll get a hold of your hair and snap your neck." He had a list of staff members that he had particular grievances with who he wanted to get his hands on. He at one point said, "I ought to just go off and make you guys commit and fight me because that would be fun."

There are vulnerable patients at the hospital, really infirm, psychotic. The staff under current Medicare rules are not allowed to defend themselves. So he is far too dangerous to be maintained in a hospital. In terms of another State institution, yeah, the prison is equipped to manage him.

RP at 475-77.

On cross-examination, defense counsel revisited the subject of Michael West's

danger to others with William Grant.

Q      A few moments ago you testified whether Mr. West should be confined to different state hospitals or prisons, correct?

A      Correct.

Q      And it was your opinion that Mr. West should be confined to the prison?

A      Yes.

Q      So prior to this incident, he was confined to the prison.

A      Yes.

Q      Was he confined in a cell with other people or solitary confinement?

A      I don't know.

Q      You were asked by Mr. Steinmetz whether or not he would be

10

appropriate for an alternative, or lesser restrictive alternative. Can you explain to the jury what that means?

    A      I took it to mean a hospital.

    Q      Okay. Is there any way that Mr. West is ever going to go to a hospital?

    A      I hope not.

    Q      I'm sorry?

    A      I hope not.

    Q      Okay. If it was your decision as to whether or not Mr. West would go from Walla Walla to a hospital, what would you offer as an opinion? Should he do it?

    A      No.

    Q      If it was your opinion that was a determinative factor as to whether Mr. West be transferred from Walla Walla to Airway Heights, what would your opinion be?

    A      My opinion would have been he should not be transferred.

RP at 505-06.

The jury rejected Michael West's insanity plea and declared him guilty of first degree and second degree assault. The trial court sentenced West to an exceptional sentence of 600 months in prison.

LAW

Michael West asks this court to reverse his convictions and remand the case for a new trial. He argues his defense counsel provided ineffective assistance when he failed to ask the trial court to acquit him by reason of insanity and when he failed to object to Dr. William Grant's prejudicial testimony. If neither error alone is sufficient to warrant reversal, West asks this court to reverse his conviction because cumulative errors denied him a fair trial. We affirm Michael West's convictions. Assuming trial counsel afforded

11

ineffective assistance by failing to ask the trial court to acquit, counsel's error did not prejudice West. The failure to object to Dr. Grant's challenged testimony did not fall below the standard of care owed by criminal defense counsel.

The Sixth Amendment to the United States Constitution guarantees the right to legal counsel in criminal trials. The Washington Constitution also grants an accused, in a criminal prosecution, the right to appear by counsel. CONST. art. I, § 22. Washington courts have not extended the protections of the state constitution beyond the protections afforded by the United States Constitution. Instead, state decisions follow the teachings and rules announced in the United States Supreme Court's seminal decision of *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). An accused is entitled to more than a lawyer who sits next to him in court proceedings. In order to effectuate the purpose behind the constitutional protection, the accused is entitled to "effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. at 688.

Under *Strickland*, courts apply a two prong test, whether (1) counsel's performance failed to meet a standard of reasonableness, and (2) actual prejudice resulted from counsel's failures. *Strickland*, 466 U.S. at 690-92. To prevail on his claim, a defendant must satisfy both prongs of the ineffective assistance of counsel test. *State v. Hendrickson*, 129 Wn.2d 61, 77-78, 917 P.2d 563 (1996), *overruled on other grounds by Carey v. Musladin*, 549 U.S. 70, 127 S. Ct. 649, 166 L. Ed. 2d 482 (2006). If one prong

12

of the test fails, we need not address the remaining prong. *Hendrickson*, 129 Wn.2d at 78.

To prevail on an ineffective assistance of counsel claim, the defendant must show that counsel's performance fell below an objective standard of reasonableness. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Such a standard echoes the standard of care applied in a civil legal malpractice suit. *Hizey v. Carpenter*, 119 Wn.2d 251, 261, 830 P.2d 646 (1992). A claim that trial counsel was ineffective does not survive if trial counsel's conduct can be characterized as legitimate trial strategy or tactics. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011), *cert. denied*, 135 S. Ct. 153, 190 L. Ed. 2d 112 (2014); *Hendrickson*, 129 Wn.2d at 77-78.

We give great deference to trial counsel's performance and begin our analysis with a strong presumption that counsel was effective. *Strickland*, 466 U.S. at 689; *McFarland*, 127 Wn.2d at 335; *Grier*, 171 Wn.2d at 33. To rebut this presumption, a defendant must demonstrate trial counsel's conduct could not be characterized as a legitimate trial strategy or tactic. *Grier*, 171 Wn.2d at 33; *Hendrickson*, 129 Wn.2d at 77-78. The relevant question is not whether counsel's choices were strategic, but whether they were reasonable. *Roe v. Flores-Ortega*, 528 U.S. 470, 481, 120 S. Ct. 1029, 145 L. Ed. 2d 985 (2000).

To satisfy the prejudice prong, the defendant must establish that there is a reasonable probability that, but for counsel's deficient performance, the outcome of the

proceedings would have been different. *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694; *State v. Thomas*, 109 Wn.2d 222, 226, 743 P.2d 816 (1987).

We first address whether trial counsel rendered ineffective assistance when he failed to move the court to acquit West by reason of insanity. West contends there was no conceivable trial strategy or tactic behind counsel's failure to move for acquittal because the case would still proceed to the jury if the court denied his motion. The deficient performance prejudiced him, he argues, because the trial court would have granted his motion.

Under RCW 10.77.080, a defendant may move the court to acquit him on the grounds of insanity. RCW 10.77.080 provides:

> The defendant may move the court for a judgment of acquittal on the grounds of insanity: PROVIDED, That a defendant so acquitted may not later contest the validity of his or her detention on the grounds that he or she did not commit the acts charged. At the hearing upon the motion the defendant shall have the burden of proving by a preponderance of the evidence that he or she was insane at the time of the offense or offenses with which he or she is charged. If the court finds that the defendant should be acquitted by reason of insanity, it shall enter specific findings in substantially the same form as set forth in RCW 10.77.040. If the motion is denied, the question may be submitted to the trier of fact in the same manner as other issues of fact.

This statute grants a criminal defendant two bites of the proverbial pear. If the trial court denies the acquittal, the defendant may also ask the jury to render an acquittal because of

insanity. *State v. Barrows*, 122 Wn. App. 902, 907, 96 P.3d 438 (2004).

The State disagrees that a motion to the trial court for acquittal by reason of insanity is a statutory alternative to a jury trial. The State also argues that, even assuming Michael West could seek acquittal from both a judge and jury, disadvantages accompany a motion to the trial court such that trial counsel could have forgone a motion to avoid the harm. We do not address the State's contentions, since we otherwise rule that Michael West can show no prejudice by the failure to forward the motion.

To repeat, in order to satisfy the prejudice prong, the defendant must establish that "there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different." *State v. Kyllo*, 166 Wn.2d at 862. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694; *State v. Thomas*, 109 Wn.2d at 226 (1987). West argues the outcome would have been different because the trial court likely would have granted a motion to acquit by reason of insanity. We disagree.

We recognize difficulty that a defendant encounters when attempting to establish the likelihood of a different outcome, a difficulty that may render placing the burden of proof on the defendant unfair in some circumstances. In this appeal, however, the State could meet any shifting of the burden to it by showing the lack of prejudice.

A court may grant a defendant's motion to acquit by reason of insanity only if the defendant shows by a preponderance of the evidence that he was insane at the time of the

offense with which he is charged. RCW 10.77.080. To establish insanity a defendant must show he was unable to perceive the nature and quality of the act with which he is charged or that he was unable to tell right from wrong. RCW 9A.12.010.

Both trial expert witnesses, including Michael West's expert Kenneth Muscatel, testified that they had no doubt West understood the nature and quality of the acts with which he was charged. While acknowledging this weakness in his argument, West contends Muscatel opined that he did not understand the wrongfulness of his conduct at the time of the assaults. West misreads Muscatel's testimony. Muscatel testified it was difficult to determine whether West understood the wrongfulness of his conduct at the time, because "[West] doesn't remember big chunks of what happened." RP at 418. Muscatel testified that he could not determine whether West understood the wrongfulness of his conduct because West did not remember why he assaulted his cellmates. Muscatel did not testify that West could not understand the wrongfulness of his conduct. More importantly, Michael West accurately conveyed to William Grant his violent behavior and any judge will wonder if West spoke truthfully to Dr. Muscatel when denying knowledge.

The preponderance of the evidence shows Michael West knew both the nature and quality of his acts as well as the wrongfulness of his conduct when he assaulted Bolstad and Welch. Based on the account West omitted from his interview with Muscatel, Dr.

16

Grant concluded by a preponderance of the evidence that West knew right from wrong when he attacked Chad Bolstad and Gary Welch.

Michael West suffered no prejudice from trial counsel's failure to ask the trial court for an acquittal. Therefore, we next ask whether Michael West received ineffective assistance of trial counsel when his counsel failed to object to William Grant's testimony that he is so dangerous that he could not be housed in a hospital. To succeed on an ineffective assistance claim predicated on a failure to object to evidence, a defendant must show: (1) counsel's failure to object fell below prevailing professional norms, (2) the trial court would have sustained the objection if counsel made it, and (3) the result of the trial would have differed if the trial court excluded the evidence. *State v. Sexsmith*, 138 Wn. App. 497, 509, 157 P.3d 901 (2007). Michael West ignores this three element standard by arguing Dr. Grant's testimony was inflammatory, prejudicial, and misleading.

We conclude trial counsel's failure to object to the evidence was not deficient. The trial court would likely have denied the objection since the evidence was relevant to issues at trial. The court tasked the jury with determining whether and how West should be confined if found not guilty by reason of insanity. West's counsel's failure to object could have been tactical. "Counsel may not have wanted to risk emphasizing the testimony with an objection." *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 714, 101 P.3d 1 (2004). Because counsel's conduct can be characterized as tactical, there can be

17

no deficient performance. *Davis*, 152 Wn.2d at 714.

Finally, we address Michael West's contention that cumulative errors denied him a constitutionally fair trial. We have already concluded there was no error, however. Absent prejudicial error, there logically can be no cumulative error that deprived a defendant of a fair trial. *State v. Stevens*, 58 Wn. App. 478, 498, 794 P.2d 38 (1990).

## CONCLUSION

We affirm Michael West's convictions for first degree and second degree assault.

_____
Fearing, J.

WE CONCUR:

_____
Siddoway, C.J.

_____
Brown, J.

18