IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 34853-9-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BILLY SAMUEL TEMPLE, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, J. — We must decide whether appellant Billy Temple's trial counsel engaged in a legitimate trial strategy when declining to assert self-defense, despite Temple testifying that his girlfriend's father attacked him first, and instead arguing that Temple lacked any criminal intent when punching the father twice. A jury convicted Temple of second degree assault because of the punches. He contends on appeal ineffective assistance of counsel. We agree with Temple and reverse his conviction because of the important constitutional right to effective assistance of counsel.

FACTS

This appeal concerns a confrontation between Billy Temple and his significant other's father, Carey Cook (Cook). Temple is ten years younger and seventy pounds

lighter than Cook. Because we must determine whether defense trial counsel performed ineffectively with his trial tactics and because we view the performance of counsel based on the complete trial record, we later quote at length trial testimony.

On May 15, 2016, Carey Cook, his brother, Dave Jordan, his daughter, Jamie Cook (Jamie), his daughter's boyfriend, Billy Temple, and Cook's two young grandchildren lived at one Spokane residence owned by Cook. Cook generally slept in a recreational vehicle, which he parked in the backyard. Cook allowed his family to sleep in his small abode. Jamie and Billy Temple, and the couple's children, occupied one bedroom. Cook's brother, Dave Jordan, slept on a daybed in the living room.

As of May 15, Jamie and Billy Temple had resided in Carey Cook's house for two weeks. Cook and Temple had known each other for one year and, by May 2016, suffered a deteriorating relationship. The younger couple allowed Cook's dogs to escape the home and roam in the yard, a practice that irritated Cook.

On the morning of May 15, Billy Temple worked on his car along the curb of the street in front of the residence. One of Jamie's eighteen-month-old daughters played near Temple. Temple went inside the home to retrieve an object but did not bring the daughter with him. A concerned Carey Cook yelled about the lack of supervision of his granddaughter. Jamie heard her father yell. Jamie told her father to mind his own business, because Temple and she knew how to raise children.

On the night of May 15/16, Carey Cook slept in his recreational vehicle. Around 1:00 a.m., Cook left his small quarters to use the house restroom. On entering, Cook noticed his brother, Dave Jordan, watching the front yard because Billy Temple or Jamie had sent the dogs outside. An incensed Cook yelled, which stirred Temple and Jamie. Cook entered the bathroom and slammed the door.

While inside the bathroom, Carey Cook heard Billy Temple and Jamie talking, but could not hear their words. Cook entered the bedroom to speak with Jamie. At trial, Cook described what transpired next:

> I walked in the [bedroom] door and I leaned up against the crib, and at that time, I thought [Temple] was going to exit the room, and then he said you are going to call the police and came up and instantly head butted me, and then I was dazed from that, and I think I tried to reach out and shove him away, but I'm not sure because the next thing I know a fist came across my eye downward, and after that, I was knocked unconscious and fell on the floor, and when I came to, I was [sic] blood was coming out of my eye and out of my nose, and I grabbed my eye because I couldn't see out of it.
> So I'm yelling you blew my eye out. You blew my eye out. Call 911. Call 911, and at that point, my daughter said well, if you call the police, we're [Temple and I are] going to tell them that you head butted him [Temple].

Report of Proceedings (RP) at 93-94.

Dave Jordan saw Billy Temple move his arm to hit Carey Cook, but did not see Temple strike Cook. Jordan did not notice any injuries on Temple.

According to Billy Temple, Carey Cook yelled inside the home before Cook entered the bedroom. Temple maintains he desired to leave the room but Cook clogged

3

the bedroom doorway because of his large size. Cook denies he blocked exit from the

room. During direct examination at trial, Temple narrated the squabble:

> I tried to walk out the door, and we had got into a confrontation right then and there. [Cook] had reached up and grabbed me by the throat. I had two necklaces on and a black hoodie. He reached up and grabbed my throat, and he head butted me like that, and I head butted him back, and then we got into an altercation.
> Q And what do you mean by altercation?
> A Well, he wouldn't let go of my throat, and I kept telling him to quit, and I hit him once, and we kind of got into the doorway, and I said enough's enough, and I hit him again, and he kept screaming at the top of his lungs, and he wouldn't let go of my throat, and by that time, he got wedged in because the babies' crib and the closet and the bed. He got wedged into between there, and he went down.
> Q When he was wedged into there, what did you do?
> A I was trying -- he was like this. He wouldn't let go of my throat. He wasn't all the way on the ground, but he was just wedged.
> Q Once separated, what did you do?
> A I said that's enough.
> Q Do you recall if Mr. David Jordan was present?
> A I felt somebody hit me from behind. I don't know if it was him. It could have been. It could have.
> Q Did you assault David Jordan that night?
> A No, sir.
> . . . .
> Q On May 16th or 15th or 16th, did you intentionally assault Carey Cook?
> A I did not.
> Q But you admit you head butted him?
> A Yes, sir.
> Q And you admit you punched him?
> A Yes.
> . . . .
> Q Was there any reason why you would not have intended to assault Mr. Cook that night?
> A There's no reason. . . .

4

RP at 137-40.

During trial when asked about his relationship with Carey Cook, Billy Temple

replied:

> I like him. I mean, he's always done nice things for me, Jamie and the kids. He was letting me stay there. I just didn't intend to do any harm to him. I didn't want to. That's my kids' grandpa. You know what I mean? He just doesn't like me, so.

RP at 140.

On cross-examination, Billy Temple testified:

> Q On the morning of May 16, 2016, your testimony is you intentionally head butted Mr. Cook, didn't you?
> A No.
> Q You didn't testify earlier that you head butted Mr. Cook?
> A I testified that as Mr. Cook was standing in the door, I was trying to leave. I didn't want any kind of altercation with Mr. Cook. Mr. Cook reached up, grabbed my throat.
> Q Sir, my question to you is did you intentionally head butt Mr. Cook?
> A I guess if you put it that way after I was head butted.
> Q Sir, my question is, and I am putting it that way. Did you intentionally head butt Mr. Cook that morning?
> A After I was head butted, yes, sir.
> Q Sir, yes or no is all you need to reply.
> A Yes, sir.
> Q Did you intentionally punch Mr. Cook that night?
> A Yes.
> Q Did you, in fact, intentionally punch Mr. Cook twice that night?
> A I did not intentionally try to assault Mr. Cook.
> Q Sir --
> A Yes, sir.
> Q The Court defines what an assault is. My question to you is did you intentionally punch Mr. Cook twice that morning?
> A We were in an altercation.

5

Q Sir, it's a very simple yes or no.

A I know what you're saying.

Q Did you intentionally punch Mr. Cook twice that morning?

A No, sir. I did not want to intentionally to [sic]do harm to Mr. Cook.

Q That's not the question.

A I said no, sir.

Q Now, your testimony earlier you testified that you punched him, hit him twice. Are you now changing that testimony saying you didn't punch him twice that morning?

A I'm saying we were in a physical altercation, and I did punch him.

Q Sir, so did you intentionally punch Mr. Cook twice that night in the head as a matter of fact?

A Yes, sir.

Q And, in fact, didn't Mr. Cook go down after the second time you punched him?

A Yes.

Q Did you see the injuries Mr. Cook had after you head butted him and punched him twice?

A I seen that his face was red. Not until after it was over did I see what the injuries looked like, and I said that was enough. It's enough.

Q In fact, you testified earlier exactly that. At one point, you said that's enough, and that's when you punched him the second time, and he went down, correct?

A No.

Q Can you tell me the sequence then?

A He was in the doorway. Do you want me to break it down the way it was?

Q You had testified earlier that you said enough is enough, so you hit him again; is that correct?

A The whole time, sir --

Q It's a very simple question. Yes or no?

A Yeah, no.

Q At one point, you testified you said to yourself enough is enough, and you hit him again; is that correct?

A No, that is not correct, sir.

Q So what happened? What is your testimony now?

A My testimony is the same as it's always been. He was in the doorway. I knew that Mr. Cook was going to call the cops.

Q Sir, my question is about when you said enough is enough, and you hit him again.

A No, sir, I did not hit him again.

Q You hit him twice, though?

A There was a head butt, and then there was two punches.

Q Correct. And before your second punch, you had said to yourself enough is enough, correct?

A I don't remember what I said to myself.

RP at 141-44.

Jamie Cook also testified that her father acted as the aggressor. Jamie averred at

trial:

Q And what happened after you heard the door slam?

A My dad was screaming. He came running down the hallway, went into the bathroom, slammed the door, was screaming. He used the bathroom and then came into the room and confronted—

Q If I could stop you there? Do you recall what he was screaming or yelling? What he was screaming?

A You want me to cuss? He was mostly profanities. . . .
. . . .

Q (By Mr. Reid) Did he ever express a reason why he was upset with you?

A Because of the dogs getting out.

Q Okay. So he went into the bathroom and then what did he do after [he] came out of the bathroom?

A He came around to my room.

Q Okay.

A Right in the doorway.

Q Okay. I'm sorry. One question then. Was the door open or closed?

A I believe it was open.

Q Okay. Do you recall if he knocked?

A No.

Q And he came into the bedroom or he came to the door?

A Right in the door frame.

Q Okay. And when he was in the door frame, what did he do or

say?

A He started—he was just using, yelling at Billy . . . .

. . . .

Q (By Mr. Reid) What did he do?

A He got in Billy's face, and then he grabbed Billy by the neck and head butted him, and then they had started like pushing kind of back and forth. I think Billy at that point, Billy—

Q I'm sorry. So he was in the door frame. There was some contact between them. At any point, did you see Billy head butt Carey?

A After my dad head butted him, yes.

Q Where was Billy in the bedroom in relation to the door?

A Say that again.

Q Where was Billy in the bedroom in relation to the door? How far away was he from your dad?

A Not that far. You come into the door. There's a filing cabinet in this little space, and there's a little walkway to where my bed was, and we were pretty much right there.

Billy had gone—

Q You were pretty much right there. How far distance wise? A couple of feet?

A I don't know.

Q Okay.

A From here to there to her.

MR. REID [defense counsel]: For the record, pointed to the court reporter.

Q (By Mr. Reid) And after these head butts, what did your father do?

A Something happened before that, so.

Q After the head butts, what did your father do?

A Ended up locking arms and were like kind of pushing and shoving.

Q Okay.

A My -- they had next to the closet—

Q Sorry.

A Yeah.

Q After the pushing and shoving, where was your dad?

A They were still right by the door, in between the door and the closet frame.

Q Okay. At some point, did they separate?

A They stumbled to the ground, and then my uncle—during that, my

uncle came in and started hitting him, and at that point, I pulled them like away from each other.

Q Okay. And when you pulled them away from each other, where did -- where did your dad go?

A He had stumbled onto the floor in between the bed -- or the crib and the closet, the little space.

Q And where did Billy go?

A Back towards where I was more towards the bed.

RP at 127-30.

Billy Temple and Jamie left the home after the altercation. Carey Cook's brother, Dave Jordan, phoned law enforcement and also requested an ambulance. When later interviewed by police, Temple admitted to hitting Cook, but claimed he acted in self-defense. Jamie also told law enforcement that Temple acted in self-defense.

Dr. Anthony Mueller, who treated Carey Cook at the emergency room, diagnosed Cook with fractures of two small bones that supply structural support for the left eye. Cook also suffered a fractured anterior left sinus wall, in addition to changes in his vision. Dr. Mueller agreed the injuries were consistent with "a head butt." RP at 123.

## PROCEDURE

The State of Washington charged Billy Temple with second degree assault. Because Billy Temple asserts ineffective assistance of counsel on appeal, we spend many pages quoting arguments and remarks made by trial counsel regarding Temple's theories at trial.

After trial began, the State moved to prevent Jamie Cook from making any

statement that Temple acted in self-defense, and defense counsel agreed, by announcing that Temple did not claim self-defense.

After both parties rested, the State expressed concerns regarding the defense's decision to not claim self-defense despite defense witnesses' testimony evincing Carey Cook as the instigator. The State expressed a desire to tell the jurors they were not permitted to consider self-defense since Temple did not assert the theory. Defense counsel responded:

> I guess I would have to look up [the] self-defense instruction whether or not I will—I believe that I elicited sufficient testimony if I wanted to offer it that I could.
> You know, I don't know. I'm really not sure what the State's—it would appear that the State wanted to argue this isn't self-defense even if I'm not arguing it. If they want to argue self-defense and they put the instruction in, I'll ask for it so the jury's not confused about what the instructions say.
> Because I anticipated the State stands up and says this isn't self-defense, you're going to have jurors looking through the instruction saying where does it talk about self-defense. He talked about self-defense.
> If we're going to go down that road, I would offer the instruction. . .

RP at 152.

The State argued jurors should not be instructed on self-defense because the State received no notice. In response, defense counsel declared:

> Your Honor, self-defense is an affirmative defense, and I totally agree that in the anticipation of trial if I was—if our theory was self-defense, I would have offered self-defense.
> . . . .
> I would submit that the State says look at your instructions or I would proffer the self-defense instruction. I believe that the testimony

elicited would provide a substantial evidence that we have proven by a preponderance of the evidence that this could be self-defense.

The Court heard my opening statement. The Court heard the trial up to that point. The fact that facts developed in Ms. Jamie Cook's testimony and into Mr. Billy Temple's testimony creating the possibility this was his defense the State can argue in their closing argument that [defense counsel] said this was all an accident, and now he's here saying it's self-defense.

That's a whole separate issue for the State to present to the jury, but for the State to say we want to say what it isn't and not tell them what that means is prejudicial to Mr. Temple.

So if the State's going down this isn't self-defense, I'm asking for the instruction.

RP at 154-55. After the lengthy colloquy, the defense decided to forego mentioning self-

defense to avoid an instruction on it to the jury.

Defense counsel argued during closing that Billy Temple lacked the requisite

intent to commit a crime. Counsel also contended that Carey Cook's testimony lacked

sense:

Now the confrontation at that point was verbal, but he [Carey Cook] confronted them, but at the end of his [Cook's] testimony when I asked him you walked in. You didn't say anything to Mr. Temple. You didn't say anything to your daughter, and Mr. Temple just head butted you and left? Yes.

That doesn't make sense. You're [Carey Cook is] angry. You're angry all day. You go inside. You're in the bathroom. You don't really hear what's going on, but you think they're talking about you. So you go in looking to have a discussion, and the testimony was I didn't say anything. He [Billy Temple] just head butted me.

Now, we heard from Jamie Cook. Jamie says we [Billy Temple and she] were there. We were in the bedroom, smaller bedroom, stuff all over the room. Carey [Cook] came in. He stood in front of the door. He said some things. She said screaming. There was some yelling, and that Mr. Carey Cook grabbed Billy Temple by his throat, by his collar and head

11

butted him, and that Mr. Temple responded in kind, grabbed him, and he head butted him and then punched him.

We then heard from Billy Temple. I [Temple] was there. I was in the room, me and my significant other, my girlfriend were having a discussion or even an argument, and Mr. Cook came in and he confronted us, and he grabbed me and head butted me, and I grabbed him and head butted him, and I punched him not once, not twice, but twice and said that's enough.

There were some common threads. We heard from all three witnesses that Mr. Temple wanted to leave. When Mr. Cook came into the room, he made for the exit -- he made for the door. At that point, he was positioned physically where Mr. Cook stood between him and the door.

So what Mr. Temple's intention was and what you heard his testimony was that I wanted to leave. I wanted to exit, and he was contacted.

So the question becomes in determining intent, and you'll all have a copy of the instructions. Look at Instruction Number 9 because if you look at Instruction Number 9, it doesn't only say intent is -- I'll just read it because it's a little bit easier.

A person acts with intent or intentionally when acting with the objective or purpose to accomplish a result that constitutes a crime. It's not just that they act with intent or intentionally, but what they have to do and what they have to intend when they do it has to be a crime, and that's not what it was.

He wanted to leave. He was contacted. He was grabbed, head butted, head butted back, punched and walked out and to each instance, he said I wanted to leave.

. . . .

You heard from Mr. Temple. Mr. Temple, in fact, Mr. Temple said, admitted and said you know what? I hit him twice. I punched him twice. Well, that was he [said] here. He had heard Mr. Cook testify. He didn't have to say I hit him twice. He heard Jamie Cook testify. She said he punched him once. He didn't have to say that. He said what he did, and the reason why he said what he did is because what he was doing was not intending to commit a crime. What he was doing was intending to leave. He wanted out of the bedroom.

If in your deliberation you conclude that his intention was not to commit a crime, but was to leave and that this physical confrontation occurred, but it was not his intent to commit a crime, it's your duty to

return a verdict of not guilty because the State will have not met one of the elements, which is that they have to establish beyond a reasonable doubt that what he intended when he went to leave the room was to assault Carey Cook, and you heard testimony that that's not what his intent was, and you not only heard it from Billy Temple. You heard it from Jamie Cook, and you heard it from Carey Cook because that's what he said he did. He went to leave. That was his intent.

So while it's understandable that the injury that Mr. Cook suffered was no doubt painful and no doubt had an impact on him, your analysis and what you're going to be deliberating about is what he was thinking when he went to leave because he was trying to leave, and he was stopped, and it's at that moment that the analysis breaks down, and you return a verdict of not guilty.

RP at 177-80.

The State's counsel, in closing statement rebuttal, responded to defense counsel's

closing argument:

Ladies and gentlemen, as you heard in your instructions, what the lawyers say is not evidence, and it's not the law. The Judge gives you the law, and Mr. Reid [defense counsel] did not accurately represent what the law [is] as given to you by the Judge. That is not what the State has to prove.
. . . .
What we have to prove is he [Billy Temple] intentionally assaulted him [Carey Cook], and by his [Temple's] own words, he intentionally swung his fist and hit Mr. Cook twice. He intentionally assaulted Mr. Cook. That was his intent when he swung his fist twice, and when he head butted Mr. Cook, his intention was to assault Mr. Cook.

What you have to decide was did he accidentally head butt him? No, or did he intentionally head butt him. It was an intentional assault, and assaulting someone is a crime.

Again, Mr. Reid read to you [Instruction] Number 9. A person acts with the intent or intentionally when acting with the objective or purpose to accomplish a result that is a crime.

13

Assault is a crime. Head butting someone is a crime. Punching someone is a crime. That's what Mr. Temple's intent was. That's the State's burden.

Our burden is not to show what he was intending to do when he left the room. No. No. Our burden is to show that Mr. Temple intentionally struck Mr. Cook, and he admitted he did that.

Another thing is all the witnesses testified to that other than Mr. Jordan who didn't see him, but only saw Mr. Temple raising his fist. All the evidence is the same as to that. No one is contradicting the fact that Mr. Temple intentionally assaulted Mr. Cook, and that is what the State has to prove, ladies and gentlemen, and that's reaffirmed as I talked about earlier in the second element.

That clearly says that the defendant recklessly inflicted the bodily harm. We don't have to prove that he intentionally did that at all. Only that he was reckless when he head butted and struck Mr. Cook twice.

RP at 180-82.

Based on a jury verdict of guilty, the trial court convicted Billy Temple of second degree assault.

## LAW AND ANALYSIS

Billy Temple's sole assignment of error is that trial counsel performed ineffectively when failing to argue self-defense and seek a jury instruction allowing the jury to acquit him on the basis of self-defense. Asserting ineffective assistance of counsel on appeal frustrates the judicial process since the appellate court indirectly reviews an issue not brought to the attention of the trial court. The State may need to incur the cost of a second trial through no fault of its own. Going further, in this instance, the State and the trial court suggested, if not encouraged, defense counsel to raise self-defense, but counsel employed a different tactic. Nevertheless, the accused's right to

14

competent counsel preempts efficiency of the judicial system. Guilt or innocence should not depend on the performance of the defendant's trial attorney. The constitution guarantees effective assistance of counsel in order to ensure that a defendant receives due process, because counsel helps ensure that the defendant presents a defense that furthers a fundamentally fair trial. *State v. Loher*, 104 Haw. 205, 398 P.3d 794 (2017).

The Sixth Amendment to the United States Constitution and article I, section 22, of the Washington Constitution guarantee the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). Washington courts have not extended the protections of the state constitution beyond the protections afforded by the United States Constitution. Instead, state decisions follow the teachings and rules announced in the United States Supreme Court's seminal decision of *Strickland v. Washington*, 466 U.S. 668 (1984). An accused is entitled to more than a lawyer who sits next to him in court proceedings. In order to effectuate the purpose behind the constitutional protection, the accused is entitled to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. at 686.

A claim of ineffective assistance of counsel requires a showing that (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. at 687. If one prong of the test fails, we need not address the remaining prong. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563

(1996).

For the deficiency prong of ineffective assistance of counsel, this court gives great deference to trial counsel's performance and begins the analysis with a strong presumption that counsel was effective. *State v. West*, 185 Wn. App. 625, 638, 344 P.3d 1233 (2015). Deficient performance is performance that fell below an objective standard of reasonableness based on consideration of all the circumstances. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). The appellant bears the burden to prove ineffective assistance of counsel. *State v. McFarland*, 127 Wn.2d at 335.

Courts cannot exhaustively define the obligations of counsel or form a checklist for judicial evaluation of attorney performance. *Strickland v. Washington*, 466 U.S. at 688 (1984). Nevertheless, effective representation entails certain basic duties, such as the overarching duty to advocate the defendant's cause and the more particular duty to assert such skill and knowledge as will render the trial a reliable adversarial testing process. *Strickland v. Washington*, 466 U.S. at 688*; In re Personal Restraint of Yung-Cheng Tsai*, 183 Wn.2d 91, 100, 351 P.3d 138 (2015).

The State astutely relies on the principle that trial strategy and tactics cannot form the basis of a finding of deficient performance. *State v. Johnston*, 143 Wn. App. 1, 16, 177 P.3d 1127 (2007). The defendant must show in the record the absence of a legitimate strategic or tactical reason supporting the challenged conduct or omission by counsel. *State v. McFarland*, 127 Wn.2d at 336. Imposing the burden on the defendant invents

16

problems since the imposition requires the defendant to prove a negative. Presumably the defendant must fashion straw men or women and then dissemble them. In practice, the State typically posits one or more reasons for a tactical decision. The Supreme Court nonetheless remains firm that no presumption of ineffective representation exists. *State v. McFarland*, 127 Wn.2d at 336. Thus, in the end, the defendant holds the burden of showing a lack of a legitimate strategy.

An argument that trial strategy informed trial counsel's performance does not end our inquiry. Not all defense counsel's strategies or tactics are immune from attack. *In re Personal Restraint of Caldellis*, 187 Wn.2d 127, 141, 385 P.3d 135 (2016). A criminal defendant can rebut the presumption of reasonable performance by demonstrating that no conceivable legitimate tactic explains counsel's performance. *In re Personal Restraint of Caldellis*, 187 Wn.2d at 141; *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004). The relevant question is not whether counsel's choices were strategic, but whether they were reasonable. *Roe v. Flores-Ortega*, 528 U.S. 470, 481, 120 S. Ct. 1029, 145 L. Ed. 2d 985 (2000); *State v. Grier*, 171 Wn.2d at 34 (2011). Competency of counsel is determined based on the entire record below. *State v. McFarland*, 127 Wn.2d at 335 (1995).

We disagree with the State and conclude that no reasonable trial strategy explains defense counsel's failure to argue self-defense and to request a self-defense instruction. Ample evidence supported the defense. Both Billy Temple and Jamie Cook testified that

Carey Cook initiated the physical confrontation by head butting Temple first. In turn, Temple punched Cook twice only because Cook grabbed Temple's throat, attempted to strangle Temple, and would not release Temple's throat. Temple ended his attack only after Cook released his grip on Temple's neck. Temple would have suffered no harm by asserting self-defense, such that no legitimate trial strategy served the withholding of the defense.

Billy Temple primarily contends that his trial counsel should have sought a self-defense jury instruction. Counsel's failure to request a necessary instruction can constitute ineffective assistance of counsel. *State v. Thomas*, 109 Wn.2d 222, 229, 743 P.2d 816 (1987). For one to show ineffective assistance of counsel for failing to request a jury instruction, the defendant must establish entitlement to the instruction. *State v. Johnston*, 143 Wn. App. at 21 (2007). We conclude that the facts merited a self-defense jury instruction.

The use of force may be lawful if a party is about to be injured. RCW 9A.16.020(3). A defendant's use of force against another, to a degree that otherwise would constitute second degree assault, is justifiable when the defendant faces injury and when the defendant employs no more force than necessary. RCW 9A.16.020(3); *State v. Hendrickson*, 81 Wn. App. 397, 400, 914 P.2d 1194 (1996). The trier of fact assesses evidence of self-defense from the perspective of a reasonably prudent person standing in the shoes of the defendant, knowing all the defendant knows and seeing all the defendant

sees. *State v. Riley*, 137 Wn.2d 904, 909, 976 P.2d 624 (1999). For the jury to be instructed on self-defense, the defendant must produce some evidence regarding the statutory elements of a reasonable apprehension of great bodily harm and imminent danger. *State v. Janes*, 121 Wn.2d 220, 237, 850 P.2d 495 (1993). To raise the defense, the defendant need only produce "some evidence" tending to establish it. *State v. Janes*, 121 Wn.2d at 237. The threshold burden is low and the defense evidence need not be sufficient to create a reasonable doubt. *State v. Janes*, 121 Wn.2d at 237. A defendant's testimony alone suffices to raise the issue of self-defense. *State v. Adams*, 31 Wn. App. 393, 396, 641 P.2d 1207 (1982).

By reason of Carey Cook's purported chokehold on Billy Temple, Temple faced serious injury. Temple's two punches, at least in a light favorable to him, did not exceed force needed to end the strangulation.

The State argues that, even under Billy Temple's version of the facts, Temple employed excessive force by punching Carey Cook twice after Cook head butted Temple. The State's argument ignores the testimony that, after Cook head butted Temple, Cook also strangled Temple. We agree that Temple imposed serious injury on Cook, but a reasonable jury could conclude that the strangulation required strong punches.

The State also contends that Billy Temple presented no testimony that he feared injury at the hands of Carey Cook. Self-defense, however, does not require fear of the confrontation's other participant. An accused need only show apprehension of injury and

may assert force to prevent an offense against him. Regardless, a reasonable jury could have inferred that Billy Temple feared for himself as a result of a strangulation around his throat.

Billy Temple's counsel may have confused who holds the burden of proving self-defense or the lack thereof. Once the defendant produces some evidence, the burden shifts to the prosecution to prove the absence of self-defense beyond a reasonable doubt. *State v. Walden*, 131 Wn.2d 469, 473, 932 P.2d 1237 (1997).

Billy Temple's counsel also performed ineffectively when contending, in closing argument, that Temple lacked any intent to commit a crime because he intended to escape from the bedroom. As astutely argued by the State to the jury, the State needed to prove only that Temple intended to punch Carey Cook. The State did not need to prove Temple desired Cook to suffer injury or to disprove Temple intended to escape from the room. To form an intent to assault, the accused need not specifically intend to inflict harm or cause apprehension. *State v. Cardenas-Flores*, 189 Wn.2d 243, 266, 401 P.3d 19 (2017). The State need only show an intent to perform the physical act constituting the assault. *State v. Cardenas-Flores*, 189 Wn.2d at 266.

We also conclude that trial counsel's ineffectiveness prejudiced Billy Temple. Under *Strickland*, the defendant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. at 669 (1984). A reasonable probability is a

No. 34853-9-III
*State v. Temple*

probability sufficient to undermine confidence in the outcome. *Strickland v. Washington*, 466 U.S. at 669.

Because of the testimony of Billy Temple and Jamie Cook, including the testimony of Carey Cook becoming irate by reason of the loose dogs, a reasonable jury could have acquitted Temple of assault if the trial court instructed the jury on self-defense. A reasonable jury could conclude that Cook initiated the fight and his stranglehold on Temple necessitated punches. Therefore, we lack confidence in the jury verdict of guilty.

CONCLUSION

We reverse Billy Temple's conviction for second degree assault and remand for a new trial.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Fearing, J.

WE CONCUR:

Lawrence-Berrey, C.J.

Pennell, J.

21

No. 34853-9-III

FEARING, J. (concurrence) — I reluctantly join the majority and pen the lead opinion because I deem precedent compels our holding.  I write separately to voice concern about the ramifications of the lead opinion.

As noted in the lead opinion, Billy Temple now receives a new trial without any fault on the part of the State or any error by the trial court.  The façade of unfairness with another trial increases when considering that the State expressed concern about Temple's failure to assert the self-defense defense.  In response, defense counsel declared:

> I guess I would have to look up [the] self-defense instruction whether or not I will—I believe that I elicited sufficient testimony if I wanted to offer it that I could.

Report of Proceedings at 152.  Despite a warning about failing to assert the defense and despite knowledge that the evidence supported the defense, defense counsel never sought a jury instruction and did not argue self-defense in closing.

Since this case comes before us on direct review, we lack any evidence of the thoughts of defense trial counsel when forming his strategy.  We do not know if counsel shared his strategic plans in advance with Billy Temple and whether Temple consented to the strategy.  In retrospect, trial counsel engaged in an unreasonable strategy. Nevertheless, this court does not view ineffective assistance of counsel from hindsight. *State v. Grier*, 171 Wn.2d 17, 43, 246 P.3d 1260 (2011).

I have considered possible strategies, reasonable at the time of trial, for withholding self-defense as a defense. For all I know, counsel met with Billy Temple and Jamie Cook in advance and determined that they were incredulous witnesses. Counsel may have assessed Carey Cook as an excellent witness, whose testimony the jury would believe. Counsel may have reviewed the evidence of serious injuries to Carey Cook and the lack of evidence of injury to Billy Temple and concluded self-defense will never prevail. Therefore, counsel decided to assert the stroppy argument that Temple lacked intent to commit a crime. One never knows what arguments a jury will accept. Conceivably, counsel may have decided to present the lack of intent argument and forego a self-defense theory with the expectation that his client would receive a second trial based on ineffective assistance of counsel and thereby gain the client one free trial with the possibility of an acquittal in the free trial.

As noted in the lead opinion, trial strategy and tactics cannot form the basis of a finding of deficient performance. *State v. Johnston*, 143 Wn. App. 1, 16, 177 P.3d 1127 (2007). The defendant must show in the record the absence of a legitimate strategic or tactical reason supporting the challenged conduct of omission by counsel. *State v. McFarland*, 127 Wn.2d 322, 336, 899 P.2d 1251 (1995). For the deficiency prong of ineffective assistance of counsel, this court gives great deference to trial counsel's performance and begins the analysis with a strong presumption that counsel was effective. *State v. West*, 185 Wn. App. 625, 638, 344 P.3d 1233 (2015). In accordance

2

with these principles, we must deny a claim for ineffective assistance of counsel if we can conceive of any "legitimate tactic." *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004); *State v. Streepy*, 199 Wn. App. 487, 501-02, 400 P.3d 339, *review denied*, 189 Wn.2d 1025, 406 P.3d 283 (2017).

One might conclude that we mistakenly decide that Billy Temple's counsel performed ineffectively based on my suppositional line of thought that I implant in defense counsel. But in the end, I conclude that any such tactic lacked cogency. Counsel could have argued both a lack of criminal intent and self-defense. I should not assume that defense counsel adopted a strategy to secure Billy Temple one free trial. No precedent considers such a tact legitimate.

I also worry about the predicament faced by the trial court when the court notices that defense counsel engages in an unreasonable tactic. The law compounds this predicament when defense counsel fails to assert an affirmative defense. The trial court must refrain from correcting some of counsel's mistakes.

The Sixth Amendment to the United States Constitution precludes interfering with a defendant's autonomy to present a defense. *State v. Coristine*, 177 Wn.2d 370, 375, 300 P.3d 400 (2013). To respect the defendant's dignity and autonomy, the Sixth Amendment recognizes the defendant's right to control important strategic decisions. *McKaskle v. Wiggins*, 465 U.S. 168, 177, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984). The Sixth Amendment right to control one's defense encompasses the decision to present an

affirmative defense. *State v. Jones*, 99 Wn.2d 735, 664 P.2d 1216 (1983). Washington courts have reversed a trial court's instructing a jury, against a defendant's wishes, on the defense of insanity, *State v. Jones*, 99 Wn.2d at 747, on the defense of lack of intent and reasonable action in a child luring prosecution, *State v. McSorley*, 128 Wn. App. 598, 116 P.3d 431 (2005), and on a reasonable belief in the ability to consent in a rape case, *State v. Coristine*, 177 Wn.2d 370 (2013).

Presumably, a trial court may not force a self-defense defense on a defendant. The best a trial judge might do, on observing defense counsel failing to assert an applicable defense, is to inform the defendant of the possible defense and ask if he or she consents to the withholding of the defense as done in *State v. Coristine*, 177 Wn.2d 370. Of course, this questioning of the defendant will not prevent the defendant from later raising ineffective assistance of counsel based on counsel's unreasonable encouragement of the defendant to consent to the defense.

*Fearing, J.*
Fearing, J.

4